AMERICAN CASUALTY COMPANY OF READING, PENNSYLVANIA and Continental Casualty Company, Plaintiffs,

v.

Nicholas CONTINISIO, et al., Defendants.

Civ. A. No. 91–5107.

United States District Court, D. New Jersey.

March 30, 1993.

Richard A. Simpson, Merril Hirsh, Lisa A. Battalia, James K. Lobsenz, Ross, Dixon & Masback, Washington, DC, Gerald T. Ford, Richard M. Lagani, Siff Rosen, Newark, NJ, for plaintiffs American Cas. Co. of Reading, Pa. and Continental Cas. Co.

David R. Boyd, Robert F. Schiff, Katherine Connor Linton, Comey & Boyd, Washington, DC, Edward F. Mannino, Ann M. Caldwell, Robert P. Curley, Mannino & Walsh, P.C., Philadelphia, PA, for F.D.I.C.

Carl Oxholm, III, Ann Marie Donio, Hangley Connolly Epstein Chicco Foxman & Ewing, Philadelphia, PA, for defendants Andrew G. Berenato, John Machise, James N. Rodio, and Robert E. Small.

Richard J. Sexton, Kenney & Kearney, Cherry Hill, NJ, for defendant Nicholas Continisio.

Cynthia D. Sora, Poplar & Eastlack, Turnersville, NJ, for defendant Joseph Caruso.

## OPINION

GERRY, Chief Judge.

This is a declaratory judgment action brought by two insurance companies against the former directors and officers of a failed Savings and Loan Association, seeking a dec-laration that directors' and officers' liability insurance written by the insurance companies does not cover a suit brought by the Federal Deposit Insurance Corporation against the former directors and officers.

## BACKGROUND

In May 1991, the Federal Deposit Insurance Corporation ("FDIC") filed suit against fourteen former directors and officers ("the directors") of First Federal Savings and Loan of Hammonton ("First Federal" or "the bank"). The complaint in the FDIC action alleged breach of fiduciary duty, gross negligence, and negligence. First Federal failed during 1988. The FDIC action seeks over $60 million in damages from the directors.

Prior to its failure, the bank held directors' and officers' liability insurance written by American Casualty Company of Reading, Pennsylvania and its subsidiary, Continental Casualty Company (collectively, "the insurers" or "CNA"). The directors contend that these policies cover their defense costs for the FDIC action, as well as any damages the FDIC might recover in that action. The insurers vigorously dispute this position.

On November 22, 1991, the insurers filed this action against all the directors, seeking a declaration that two of the policies, written in 1981 and 1984, do not cover either defense costs or damages arising from the FDIC action. The FDIC has aligned itself with the directors on the coverage issue and has argued it on their behalf. The underlying FDIC action has been stayed pending resolution of the coverage issue.

## FACTS

First Federal first purchased directors' and officers' ("D & O") liability insurance written by MGIC Indemnity Corporation ("MGIC") in the mid-1970s. First Federal obtained the insurance through the Association Benefits Agency ("the Agency" or "ABA"), First Federal's insurance broker and MGIC's agent. Continental Casualty Company, plaintiff in this case, acquired MGIC's casualty insurance business in the 1980s and assumed all obligations under First Federal's D & O policy. First Feder-

al's D & O policies were renewable every three years. There are two policy periods relevant to this action—the 1981 Policy and the 1984 Policy. The two policies are identical in all terms relevant to this action with one exception: the 1984 Policy contains an added provision—a "Regulatory Exclusion"—that bars coverage for suits brought by regulatory agencies, including the FDIC.

### A. The 1981 Policy

■■■■ The 1981 Policy was in force from June 26, 1981 to June 26, 1984. The policy provides the following coverage:

> This policy shall cover *Loss in respect of any Wrongful Act* committed prior to the termination of this policy arising from any claim made (i) within the policy period or (ii) within the discovery period if the right is exercised by the Association in accordance with Clause 2(B). For purposes of this Clause 2(A), any claim made subsequent to the policy period as to which notice was given to the Insurer within the policy period ... shall be treated as a claim made during the policy period.

1981 Policy § 2(A) ("Coverage Clause") (emphasis added). This is a "claims-made" policy, because it provides coverage for events which may have occurred prior to the policy period if a claim is made during the policy period.[1] The policy does not define the term "claim."

The coverage of the policy is expanded by the "Notice of Claims" provision which provides:

> If *during the policy period* the Association or the Directors or Officers shall: (i) receive written or oral notice from any party that it is the intention of such party to hold the Directors or Officers, or any of them, responsible for a Wrongful Act; or (ii) become aware of *any occurrence which may subsequently give rise to a claim* being made against the Directors and Offi-

cers, or any of them, for a Wrongful Act; and shall, during such period, give *written notice thereof* to the Insurer as soon as practicable and prior to the date of termination of the policy, *then any claim which may subsequently be made against the Directors or Officers arising out of such Wrongful Act shall, for the purpose of this policy, be treated as a claim made during the policy year in which such notice was given.*

1981 Policy § 6(A) ("Notice of Claims" provision) (emphasis added). Under this provision, if the insured gives written notice to the insurer of "any occurrence which may subsequently give rise to a claim," against the D & Os, then a claim arising out of such an act is covered by the policy, even if the claim is made after the policy has expired.

The policy also provides that either party to the insurance contract can terminate the contract on thirty days' notice. Furthermore, an endorsement to the contract provides added protection to the bank in case of cancellation or non-renewal:

> If the Insurer shall *cancel or refuse to renew* this Policy, the [bank] shall have the right *to an extension of the cover granted by this Policy in respect of any claim or claims which may be made* against the Directors or Officers during a period of twelve calendar months after the date of such termination but only in respect of any Wrongful Act committed before the date of such cancellation or nonrenewal. The Insurer shall give written notice informing the [bank] of its option to purchase this extension at a rate of 25 percent of the current annual installment. Application for this extension must be made within thirty (30) days after the effective date of cancellation or nonrenewal of the Policy.

1981 Policy, Endorsement # 2 ("Discovery Clause") (emphasis added). This clause gives the bank the option of purchasing an

---

1. A "claims-made" policy provides coverage for claims or potential claims made against the insured directors and officers within the policy period, but only if the insurer is put on notice of such claims or potential claims during that period, or within a discovery period following cancellation of a policy. Thus, it is closed-ended. An "occurrence" policy, on the other hand, pro-

vides coverage for any occurrence during the policy period that gives rise to a future claim, regardless of when the claim is actually filed. *See Zuckerman v. National Union Fire Ins. Co.,* 100 N.J. 304, 495 A.2d 395, 398 (1985); *Samuel N. Zarpas, Inc. v. Morrow,* 215 F.Supp. 887, 888 (D.N.J.1963).

additional year of coverage if the insurance company decides to cancel or refuses to renew the D & O policy. The parties dispute the precise scope of the coverage that can be purchased under this provision.

## B. *The 1984 Policy*

The 1984 Policy was intended to be in force from June 26, 1984 through June 26, 1987.[2] Events leading up to the 1984 renewal are relevant to some of defendants' arguments concerning coverage, so we will recount them here.

### 1. 1984 Renewal

First Federal submitted its application for renewal to the Agency on June 5, 1984. The Agency forwarded it to the insurers three days later. On June 26, 1984, the Agency stated to First Federal's insurance manager that coverage had been "bound and continues.... [T]he same policy forms as MGIC apply." Munson Aff. at ¶ 15. Six days later, on July 2, 1984, First Federal received a letter from the Agency stating that the new policy would exclude suits from regulatory agencies. The Agency sent the binder and sample policy, including the regulatory exclusion, to First Federal on July 18. The binder expired August 20. First Federal accepted the new policy on August 24, 1984, with coverage bound effective June 26. The policy was formally issued on October 12, 1984.[3]

### 2. The Regulatory Exclusion

The only substantive change in the 1984 Policy relevant to this action is the inclusion of a "Regulatory Exclusion":

> It is understood and agreed that the Insurer shall not be liable to make any payment for Loss in connection with any claim made against the Directors or Officers based upon or attributable to any action or proceeding brought by or on behalf of the Federal Deposit Insurance Corporation....

**2.** The actual coverage period was less than a year, however, because the insurers terminated the contract before it had ended.

**3.** At no time did the insurers inform First Federal that it had a right to purchase a discovery period in lieu of accepting the 1984 Policy with

1984 Policy, Endorsement # 6. On September 11, 1992, this court held that the Regulatory Exclusion unambiguously bars coverage for suits brought by regulatory agencies, including the FDIC. Therefore, if the exclusion is effective (i.e., not void on public policy grounds or otherwise), then it would operate to bar any coverage under the 1984 Policy for the underlying suit, regardless of whether the insurer received adequate notice of the suit to otherwise trigger coverage. In that case, the FDIC's only argument would be that this suit (brought by the FDIC on May 2, 1991) is covered by the 1981 Policy, which by its terms expired in June of 1984.

### 3. Cancellation of the 1984 Policy

On January 7, 1985, the insurers received a request from First Federal to add additional subsidiaries to the 1984 Policy. On January 22, the First Federal Board of Directors entered into a Consent Resolution with the Federal Home Loan Bank Board (FHLBB), in which it acknowledged that the bank was in danger of default and that grounds existed for the appointment of a receiver. On February 14, 1985, the insurers mailed notice of cancellation to First Federal. The insurers maintain that they had no knowledge of the Consent Resolution at the time. There is no record of the reason for cancellation in the insurers' files, and First Federal was never informed of the reason for cancellation.

Following cancellation, First Federal purchased a one year discovery period effective March 22, 1985 through March 22, 1986.

### C. *Notices Sent During 1981 and 1984 Policy Periods*

It is uncontested that no documents purporting to be notices of either claims or potential claims were sent by First Federal or received by the insurers during the period from June 26, 1981 through March 22, 1985. The bank did send the insurers notices of both claims and potential claims by third

its restrictive regulatory endorsement. The insurers take the position that First Federal did not have the right to purchase a discovery period and therefore the insurers' failure to notify the bank of this "right" is not a breach.

parties against First Federal directors and officers during the *discovery period* running from March 22, 1985 through March 22, 1986. However, none of these notices directly discuss the potential for claims brought by the FDIC or any other regulatory agency.

## DISCUSSION

There are five motions before this court: 1) a motion for summary judgment by the insurance companies; 2) a cross-motion for partial summary judgment by the FDIC, joined by the directors; 3) a motion for partial summary judgment by four of the directors on the issue of advancement of fees; 4) a motion by one director to stay this action pending decision of a parallel state action; and 5) a motion by the insurance companies to impose sanctions on the director seeking the stay.

## I. CONTINISIO'S MOTION TO STAY THIS ACTION PENDING RESOLUTION OF HIS PARALLEL STATE COURT ACTION

Continisio filed his motion to stay this action on September 29, 1992, over six months after the cross-motions for summary judgment were filed. However, since a decision to grant a stay would moot the other motions before this court, we will reach that question first.

### A. *Procedural History*

In order to decide this motion, it is necessary to understand some procedural history. The first action filed relating to this dispute was the underlying action by the FDIC against fourteen individual directors and officers, *FDIC v. Continisio*, No. 91–2098 (D.N.J. filed May 24, 1991). The insurers were not parties. Subsequently, a dispute arose between the directors and the insurance companies over coverage. On September 30 and October 9, 1991, eight of the director and officer defendants filed third-party complaints against the insurers in *Continisio* seeking a declaratory judgment concerning coverage.[4] On November 19, 1991, Nicholas Continisio, a former director of First Federal, filed a declaratory judgment suit in New Jersey Superior Court in Atlantic County, seeking a declaration that the FDIC suit was covered by the insurance policies written by the plaintiffs in this action.[5] The defendants in the state court action were the insurers and ABA, the insurance broker, a New Jersey corporation. The FDIC was not joined in the state action. Three days later, on November 22, 1991, the insurers brought this action in federal court, seeking a declaration that they were not liable for the FDIC action. At that point, there were two nearly identical actions proceeding in state and federal court.

The state court action could not be removed to this court because it lacked complete diversity. The insurers, however, moved to have that case stayed or dismissed, or, in the alternative, to have the claim against them severed from the claim against the New Jersey corporate defendant. The state court granted the latter motion and severed the case for the purpose of having the portion of the case against the insurance companies removed to federal court. The insurers subsequently removed that portion of the case to this court.

In an opinion and order dated September 11, 1992, this court held that an involuntary severance by the state court did not create complete diversity for the purposes of removal jurisdiction. *American Casualty Co. v. Continisio*, Nos. 91–5107, 92–1720 (Sept. 11, 1992). We held that the state court declaratory judgment action had been improperly removed, and we remanded that case back to state court. Once again, there were two parallel, nearly identical actions pending in state and federal court.

Since we remanded that case, the insurers have again moved in state court to stay or dismiss that case pending resolution of this action. The state court, in an oral opinion issued by Judge Previti on October 26, 1992, granted a six-month stay of that action pend-

---

**4.** Mr. Continisio was not one of the directors filing third-party complaints against the insurers.

**5.** A second state court declaratory judgment action filed by Joseph Caruso against the same defendants was subsequently consolidated with Continisio's claim.

ing our resolution of the motions before this court today.

### B. Standard for Staying or Dismissing Declaratory Judgment Actions

Federal courts have discretion in determining whether or not to exercise jurisdiction in Declaratory Judgment actions brought pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq. Brillhart v. Excess Ins. Co.*, 316 U.S. 491, 494, 62 S.Ct. 1173, 1175, 86 L.Ed. 1620 (1942). The standards of the Declaratory Judgment Act set forth the parameters of a district court's discretion in determining whether to stay a declaratory judgment suit. *Terra Nova Ins. Co. v. 900 Bar, Inc.*, 887 F.2d 1213, 1222–23 (3d Cir.1989). Relevant factors include (1) whether the state and federal suits present the same issues; (2) whether the state court is better able to settle the controversy, including the existence of novel state law issues; (3) the adequacy and reach of the state court proceedings; (4) the obligation to discourage duplicative and piecemeal litigation; and (5) how far each proceeding has advanced. *Brillhart*, 316 U.S. at 495, 62 S.Ct. at 1176. District courts are cautioned that "[g]ratuitous interference with the orderly and comprehensive disposition of a state court litigation should be avoided." *Id.*

Application of these factors counsels against a stay in this action. The underlying action upon which a declaration is sought is pending in this court, not in the state court. Therefore, *Brillhart*'s concern with avoiding needless interference with state court litigation is not present here. Second, federal law supplies the rule of decision in this declaratory judgment action, so we need not defer to the state courts in the same manner as if we were applying New Jersey law. Third, considerations of efficiency clearly favor denying the stay in this case, since the FDIC is not a party to the state action, nor are most of the former directors and officers. The present suit joins the insurers, all the directors and the FDIC. Therefore, a resolution in state court would be inefficient because it would

not be binding on all parties in this court. A resolution in this court, on the other hand, would bind all the parties in state court with the exception of the Associated Benefits Agency, the New Jersey insurance broker. Fourth, this action is also considerably more advanced than the state action. Discovery is substantially complete here, while there is no evidence before this court that it has even commenced in the state action. This court has resolved two motions and several legal issues, including the issue of whether portions of the insurance policy are ambiguous. Therefore, the *Brillhart* and *Terra Nova* factors argue against granting a stay in this matter.

Continisio argues that we should stay this action because "whether insurance coverage exists for the alleged loss described in the FDIC lawsuit" is a case of first impression that should be decided in state court. *Brief in Support of Defendant Nicholas Continisio's Motion to Dismiss or Stay* at 5–6 (Sept. 22, 1992). We disagree. This issue is a question of contractual interpretation which can be decided under existing principles of state law. *Compare Cessna Aircraft Co. v. Fidelity & Casualty Co.*, 616 F.Supp. 671 (D.N.J.1985) (insurability of punitive damages an important state law issue of first impression). Furthermore, as discussed earlier, the law to be applied in interpreting the insurance contract is federal law.[6] Therefore, there is no overriding reason to defer to the state court in this matter.

Continisio also argues that it is particularly appropriate for a federal court to grant a stay in a declaratory judgment action involving insurance. It is true that courts in this circuit have so held. *See Terra Nova*, 887 F.2d at 1225. However, the context in which the declaratory judgment actions arose in those cases were very different than the present case. In *Terra Nova*, for example, the state action was a tort claim by a third party against the insured. While that action was pending, the insurer filed a declaratory judgment action in federal court seeking a declaration that it had no duty to defend its

---

**6.** Even the FDIC's argument that the regulatory exclusion is invalid under public policy is based upon *federal* public policy, not upon state law.

*Compare FDIC v. American Casualty Co.*, 843 P.2d 1285 (Colo.1992) (voiding regulatory exclusion under Colorado law).

insured in the state court action because the underlying action fell within the policy exclusion for intentional acts. In an insurance declaratory judgment action of that kind, it makes sense for a federal court to be more liberal in granting a stay or dismissal, since the court is concerned that issues decided in the declaratory judgment action could be *res judicata* in the underlying tort action. Where the issue is whether to stay a federal declaratory judgment action brought by an insurer in favor of a state declaratory judgment action brought by the insured, however, the reasoning in *Terra Nova* does not apply.

Continisio also relies upon the case of *Cessna Aircraft Co. v. Fidelity & Casualty Co.*, 616 F.Supp. 671 (D.N.J.1985). That court granted a stay of a federal court declaratory judgment action pending resolution of an identical state court declaratory judgment action. The court granted the stay in that case because (1) the defendants in the state court action had waived their rights to remove that case to federal court, and (2) the primary issue involved, the insurability of punitive damages awards, was a significant issue of state law that had not been addressed by the New Jersey Supreme Court at that time. Neither factor is present here, however, so *Cessna Aircraft* does not compel this court to grant a stay in the present case. Therefore, because Continisio has not demonstrated under the *Terra Nova* standards that this court should stay this action, his motion will be denied.

## II. THE INSURERS' MOTION TO IMPOSE SANCTIONS ON CONTINISIO PURSUANT TO RULE 11 FOR SEEKING THE STAY

■ The insurers are seeking as sanctions the costs they have incurred in briefing their opposition to Continisio's motion to dismiss or stay, under authority of 28 U.S.C. § 1927 and Fed.R.Civ.P. 11. Section 1927 authorizes the court to impose such costs as a sanction when an attorney "multiplies the proceedings in any case unreasonably and vexatiously." Rule 11 authorizes sanctions when motions are "interposed for [an] improper purpose, such as to harass or to cause unnecessary delay or needless increase in the costs of litigation." The insurers argue that they have essentially filed four sets of briefs on the issues involved in the instant motion, that the conclusions of the various courts show that the motion is frivolous, and, therefore, that Continisio should be compelled to reimburse them for the costs of unnecessarily briefing the same issues again.

We will deny the insurers' motion for sanctions. Continisio's arguments do not rise to the level of frivolousness that would merit sanctions, particularly given the discretionary nature of the declaratory judgment remedy. Furthermore, there has been no evidence presented that Continisio has sought the stay to harass or delay litigation, or for any reason besides the one stated, that he would prefer to litigate this matter in state court. Under these circumstances, sanctions are inappropriate.

## III. INSURERS' SUMMARY JUDGMENT MOTION AND FDIC'S CROSS-MOTION

We now proceed to the cross-motions for summary judgment, which we will consider together. The insurers argue that (1) neither the 1981 nor the 1984 Policies cover the FDIC lawsuit because the lawsuit was not a "claim made" during the periods those policies were in force; and (2) the 1984 Policy does not cover the lawsuit because the regulatory exclusion bars coverage for the FDIC lawsuit. The FDIC argues that (1) information sent by First Federal or received by the insurers during the policy periods constituted "notice of occurrences" that might give rise to claims against the insurers, triggering coverage under one or both policies; and (2) the regulatory exclusion is unenforceable because it conflicts with federal statutory law. Some of the former directors also argue that the insurers are estopped from denying coverage by failing to inform First Federal of its right to purchase a discovery period in lieu of renewing the policy and by inserting the regulatory exclusion after the 1981 Policy had already expired. Both sides contend that we can decide the coverage issue in their favor as a matter of law.

A. *May We Find as a Matter of Law that Information Sent by First Federal or Received by the Insurers During the Policy Periods Did or Did Not Constitute Notice Sufficient to Trigger Coverage?*

No one is contending that the underlying FDIC suit is a "claim" made against the D & Os during the policy period. The policies in question, however, extend coverage to *some* claims made subsequent to expiration of the policy period in the following circumstances: when, during the policy period, the insured becomes aware of "occurrence[s] which may subsequently give rise to a claim" and sends written notice of these to the insurer, then subsequent claims "arising out of such Wrongful Act" are treated as claims made within the policy period. The FDIC argues that during the policy periods the insurers received notice of acts by First Federal's directors and officers that later formed the basis for the FDIC action here. Therefore, it argues, the underlying FDIC action should be treated as a claim made under one or both of the policies. The insurers argue that no such notice was ever sent.

This court will grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). To defeat a properly supported summary judgment motion, the nonmovant must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). An issue is "genuine" only if the evidence is such that a reasonable jury could find for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Equimark Commercial Finance Co. v. C.I.T. Financial Servs. Corp.*, 812 F.2d 141, 144 (3d Cir.1987). Where the nonmoving party bears the burden of proof, the burden upon that party is to "make a showing sufficient to establish the existence of [every] element essential to that party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Equimark*, 812

F.2d at 144. All reasonable inferences to be drawn from the facts "must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

In order to grant summary judgment to the plaintiffs on this issue, this court must determine as a matter of law that there was no notice during the policy periods of an occurrence that gave rise to the FDIC action. This requires us to decide what constitutes "notice," within the meaning of the policies, and whether the information sent to the insurers satisfies this definition.

1. Whether notice was sent during the 1981 Policy Period

There were no letters sent during the 1981 Policy period that were called notices of claims or potential claims. The FDIC, however, argues that the notice requirement for coverage under the 1981 Policy was fulfilled by certain financial information sent to the insurers by First Federal when it applied for renewal of its D & O policy in mid–1984. The FDIC argues specifically that First Federal submitted an Audit Report and several Federal Home Loan Bank Board ("FHLBB") reports to the insurers with First Federal's renewal application, and that the information contained in these reports put the insurers on notice of the potential for a suit by federal regulators. Therefore, the FDIC argues, this information satisfied the 1981 Policy's coverage requirement of "written notice" of "occurrence[s] which may subsequently give rise to" the FDIC claim. They point to the fact that the insurers reacted to the application by including the regulatory exclusion in their subsequent policy issued to First Fidelity to support their argument that the insurers were in fact on notice of the potential for a regulatory suit.

The documents supporting First Federal's renewal application may have notified the insurers that the bank had serious problems. They may also have alerted the insurers to the possibility of regulatory lawsuits, and the insurers probably inserted the regulatory exclusion in the 1984 Policy in reaction. Whether the bank complied with the require-

ments of the policy by sending these documents is another question. The threshold question is whether the bank could satisfy the notice provision in the insurance contract by sending documents that contained information that alerted the insurers to potential problems, even though the information was not sent with the intention of complying with the notice provision and triggering coverage.

 Federal law governs actions to which the FDIC is a party, *FDIC v. Bank of San Francisco*, 817 F.2d 1395, 1398 (9th Cir. 1987). The parties are in agreement that in this instance the court must look to New Jersey law to give substance to the federal law. *See Adams v. Madison Realty & Dev., Inc.*, 937 F.2d 845, 856 (3d Cir.1991). Therefore, we first examine New Jersey law relevant to the interpretation of insurance contracts. Under New Jersey law, the insurance policies of large corporations are to be construed like any other contract. *McNeilab, Inc. v. North River Ins. Co.*, 645 F.Supp. 525 (D.N.J.1986), *aff'd mem.*, 831 F.2d 287 (3d Cir.1987). The interpretation of an insurance contract on undisputed facts is a question for the court to decide as a matter of law and can be the basis for summary judgment. *Weedo v. Stone–E–Brick, Inc.*, 155 N.J.Super. 474, 382 A.2d 1152, 1154 (App.Div.1977), *rev'd on other grounds*, 81 N.J. 233, 405 A.2d 788 (1979). The court, in construing an insurance contract, must "search broadly for the probable common intent of the parties to find a reasonable meaning in keeping with the express general purposes thereof." *Bello v. Hurley Limousines, Inc.*, 249 N.J.Super. 31, 591 A.2d 1356, 1361 (App.Div.1991); *see also Fidelity Union Trust Co. v. Robert*, 36 N.J. 561, 178 A.2d 185 (1962). Ambiguous language is to be construed against the insurer. *Sparks v. St. Paul Ins. Co.*, 100 N.J. 325, 495 A.2d 406 (1985). If there are two reasonable interpretations to be given to the language of the insurance contract, a court must apply that interpretation which sustains coverage. *Mazzilli v. Accident & Casualty Ins. Co.*, 35 N.J. 1, 170 A.2d 800, 803 (1961).

 In order for claims made after the policy period to be covered, the policy requires the insured to "give written notice" of the basis of the claim during the policy period. The question here is whether the bank, in sending the information contained in the renewal application, complied with the policy requirement of giving written notice. In order to make this determination, we look to the language of the notice provision, its purpose, and extrinsic evidence of the parties actual intent. Based upon this, we find that the information submitted by the bank during the renewal process did not constitute "notice" within the meaning of the policy.

a. Policy language

 Black's Law Dictionary defines "Notice" in the following ways:

Notice in its legal sense is information concerning a fact, actually communicated to a person by an authorized person, or actually derived by him from a proper source, and is regarded in law as "actual" when the person sought to be affected by it knows thereby of the existence of the particular fact in question. It is knowledge of facts which would naturally lead an honest and prudent person to make inquiry, and does not necessarily mean knowledge of all the facts. *In another sense, "notice" means information, an advice, or written warning, in more or less formal shape, intended to apprise a person of some proceeding in which his interests are involved, or informing him of some fact which it is in his right to know and the duty of the notifying party to communicate.*

Black's Law Dictionary at 1061 (6th ed. 1990) (citation omitted) (emphasis added). The FDIC would define providing "notice" as providing "knowledge." Under the FDIC theory, the notice provision would be satisfied if the insurer received information in any form that negligent acts occurred, even if the insured never intended to trigger coverage and even if the insurer did not recognize that coverage was triggered. We disagree. While the information supplied by the bank during the renewal process may well have provided "notice" in the sense of "knowledge," we read the provision as requiring some affirmative act on the part of the insured *intending* to provide written notice of

the negligent acts and of their awareness of them. It is undisputed that First Federal never sent anything purporting to be such affirmative notice. The FDIC cites cases where the courts have held that an insured is covered despite his failure to adhere to the notice provisions of the policy.[7] The cases cited deal either with a technical error in the notice sent or where the notice does not trigger the insurer's obligations under the contract and are therefore not on point.

### b. Extrinsic evidence of intent

 Our reading of the notice provision is consistent with extrinsic evidence of the parties' subsequent practice. Extrinsic evidence is admissible in New Jersey to interpret the provisions of an insurance policy. Furthermore, the subsequent practice of the parties is relevant to determining their intent, *Meier v. New Jersey Life Ins. Co.*, 195 N.J.Super. 478, 480 A.2d 919, 923 n. 6 (App. Div.1984), *aff'd*, 101 N.J. 597, 503 A.2d 862 (1986), which is the ultimate aim of contract interpretation under New Jersey law. *American Home Assurance Co. v. Hartford Ins. Co.*, 190 N.J.Super. 477, 464 A.2d 1128 (App.Div.1983). The most compelling extrinsic evidence of the parties' interpretation of the notice of claims provision is the actual notices that were sent to insurers during the discovery period. The FDIC submits these letters as evidence that notices of claims were sent during the discovery period purchased by First Federal following the cancellation of the 1984 Policy. The insurers rely on the same letters to argue that no notices of claims were sent during the 1981 Policy period.

We find the insurers' argument persuasive. During the 1984 discovery period, First Federal employees and agents sent the following:

1. A letter dated March 29, 1985, asking ABA to "apprise CNA of the possibility of a claim" arising from a loan agreement with Archwood Development and Winslow Township;

2. A letter dated September 30, 1985, enclosing a counterclaim and third party complaint making "allegations with respect to Messrs. Crowley, Pantilione, Gorab and Caruso which may be covered under the Directors' and Officers' Liability Policy heretofore issued to First Federal, Policy No. 01912–DA–01."

3. A letter dated February 19, 1986, stating "[n]otice is hereby given pursuant to CNA's Directors' and Officers' Liability Insurance Policy" that a covered officer had been named as a defendant in a case brought by First Federal.

4. A letter dated March 14, 1986, stating that "[n]otice is hereby given pursuant to CNA's Directors' and Officers' Liability Insurance Policy" that an officer of a subsidiary had been named in a countersuit;

5. A letter dated March 14, 1986, from First Federal's attorney, stating, "I wish to advise you under paragraph 6 of the above policy" that a claim might be asserted by another savings and loan against First Federal directors and officers;

6. A letter dated March 18, 1986, from First Federal's attorney, stating, "I wish to advise you under paragraph 6 of the above policy that claims may be asserted against the directors and officers of the Association by A.M.F. Consultants, Inc., Mr. Peter Dennis and Mr. Anthony Castellano arising out of the exercise by First Federal of its rights on February 17, 1986 under a certain escrow agreement dated August 26, 1985";

7. A letter dated March 18, 1986, from First Federal's insurance manager, stating, "[n]otice is hereby given pursuant to CNA's Directors' and Officers' Liability Insurance Policy" that an officer of the bank had been named as a defendant in a civil suit.

These letters sent by First Federal and its agents during the discovery period demonstrate that First Federal understood the notice provision to require some formal action on the part of the insured intending to invoke coverage. This undercuts the FDIC's argu-

---

**7.** *National Newark & Essex Bank v. American Ins. Co.*, 76 N.J. 64, 385 A.2d 1216 (1978); *Putney School, Inc. v. Schaaf*, 157 Vt. 396, 599 A.2d 322 (1991) (substantial compliance with notice requirement under claims-made policy sufficient when insured notified *broker* instead of insurance company and agency relationship existed between broker and insurance company).

ment that the notice provision should be read as synonymous with knowledge.

The insurers have also submitted a letter from First Federal's outside insurance consultant addressed to Barbara Munson, First Federal's assistant secretary, sent during the last days of the discovery period, advising First Federal that "[i]f 'anyone' is aware of a 'wrongful act' or any occurrence which may subsequently cause a claim to be made that occurred during the period June 26, 1975 to March 22, 1985, it *must be* reported prior to March 22, 1986," and "'[i]t is important that anyone who might reasonably have any knowledge of a potential claim be made aware of their obligation to report the information immediately so that notice (if appropriate) can be sent to the insurance company prior to the aforementioned deadline.'" The insurers have also submitted inter-office memoranda and minutes of directors meetings which reflect their understanding that the policy required formal written notice of wrongful acts in order to trigger coverage.

### c. Purpose of notice provision

■■■ Under New Jersey law, a court must also look to the purpose of the provisions of an insurance contract to aid in interpretation. *Kelly, Messick, Schoenleber & Miller Assocs. v. Atlantic Mut. Ins. Co.,* 218 N.J.Super. 395, 527 A.2d 946 (App.Div.1987). As explained by the New Jersey Supreme Court in *Zuckerman v. National Union Fire Ins. Co.,* 100 N.J. 304, 495 A.2d 395 (1985), the notice provision in a claims-made policy serves a different purpose than that in an occurrence policy:

> The notice requirement [in a classic occurrence policy] d[oes] not define the coverage provided by the policy, but rather [is] included to aid the insurance carrier in investigating, settling, and defending claims. By statute, failure to give the notice required by such a policy will be excused if notice is given as soon as reasonably possible. Accordingly, the requirement of notice in an occurrence policy

is subsidiary to the event that invokes coverage, and the conditions related to giving notice should be liberally and practically construed.

> *By contrast, the event that invokes coverage under a "claims-made" policy is transmittal of notice of the claim to the insurance carrier.* In exchange for limiting coverage only to claims made during the policy period, the carrier provides the insured with retroactive coverage for errors and omissions that took place prior to the policy period. Thus, an extension of the notice provision in a "claims-made" policy constitutes an unbargained-for expansion of coverage, *gratis,* resulting in the insurance company's exposure to a risk substantially broader than that expressly insured against in the policy.

*Id.,* 495 A.2d at 406 (citation omitted) (emphasis added).

Since, under New Jersey law, the purpose of sending notice under a claims-made policy is to invoke coverage, the term "notice" must be construed as requiring something more than an coincidental transmission of information, as the FDIC contends. Rather, we construe the notice of claim provision as imposing a duty on the insured to give some kind of formal, written notification of occurrences in order to evoke coverage.

### d. Is the notice provision ambiguous?

■■■ The FDIC argues that a subsequent, more precise revision of the notice provision demonstrates that the Notice of Claims provision in the 1981 Policy is ambiguous.[8] Evidence of subsequent changes in contract language is relevant to whether the language at issue is ambiguous. *Mazzilli,* 170 A.2d at 803. Under New Jersey law, ambiguities in an insurance contract are to be construed against the insurer. *See Meier v. New Jersey Life Ins. Co.,* 101 N.J. 597, 503 A.2d 862, 872 (1986). However, we can only adopt the FDIC's interpretation if it is reasonable. The FDIC's interpretation is not reasonable, nor, apparently, is it in accord

---

8. The insurers argue that subsequent revisions of the policy language should be excluded under Fed.R.Evid. 407, which excludes evidence of subsequent repairs offered for the purpose of showing negligence or culpable conduct. Since the subsequent revisions are offered by the FDIC for the purpose of showing the ambiguity of the earlier contractual language, this objection is without merit.

with *anyone's* interpretation of the contract at the time it was drafted, as demonstrated by affidavits submitted by the parties.

In support of its reading of the notice provision, the FDIC has cited several district court opinions that have held that general financial information can constitute "written notice" under identical or nearly identical notice of claims provisions. *See FDIC v. St. Paul Fire & Marine Ins. Co.*, 783 F.Supp. 1176 (D.Minn.1991) (renewal application setting forth specific negligent acts constitutes "written notice" as a matter of law); *Moore v. American Casualty Co.*, Nos. CV 89–7183, CV 90–280 (C.D.Cal. May 30, 1991) (renewal application providing substantial information on bank's financial difficulties satisfies notice provision); *Branning v. CNA Ins. Cos.*, 721 F.Supp. 1180 (W.D.Wash.1989) (same). Furthermore, two circuit courts have looked at the substance of the information supplied by insureds in their renewal applications, thereby implicitly accepting the FDIC's definition of notice. *See United Ass'n Local 38 Pension Trust Fund v. Aetna Casualty & Surety Co.*, 790 F.2d 1428 (9th Cir.1986) (whether financial information supplied with renewal application constitutes "written notice" held to be factual issue, precluding summary judgment); *California Union Ins. Co. v. American Diversified Savings Bank*, 914 F.2d 1271 (9th Cir.1990) (summary judgment granted where financial information supplied by insured with renewal application was insufficient to put insurer on notice of any potential claims), *cert. denied sub nom., Sahni v. Harbor Ins. Co.*, 498 U.S. 1088, 111 S.Ct. 966, 112 L.Ed.2d 1052 (1991). While this court has considered those cases carefully, we note that none of the cited cases squarely address the precise issue before this court, and none clearly stated whether or not in those cases extrinsic evidence of intent was present that either supported or undercut that reading of the notice provision. Furthermore, other courts have read identical notice of claims provision in the same manner as this court. *See American Casualty Co. v. FDIC*, 944 F.2d 455, 460 (8th Cir. 1991) (rejecting FDIC argument that information submitted during renewal process created question of fact whether notice provision was complied with); *American Casualty Co. v. FDIC*, 821 F.Supp. 655 (W.D.Okla. 1993) (summary judgment to insurers where information in renewal application too general); *FDIC v. Continental Casualty Co.*, 796 F.Supp. 1344 (D.Or.1991) (granting summary judgment to insurers where insured submitted documents; distinguishing between "written notice" and knowledge); *see also Heikkinen v. Aetna Casualty & Sur. Co.*, 124 Mich.App. 459, 335 N.W.2d 3, 5 (1981) (statutory requirement of written notice requires words "presented in a form or under circumstances designed to '*in fact* apprise the insurer of the need to investigate and to determine the amount of possible liability of the insurer's fund.'") (emphasis original).

Therefore, we conclude that the notice of claim provision was not triggered by the submission of financial data with a renewal application.

2. Did the insurers breach a contractual obligation to notify First Fidelity of its right to purchase a discovery period at the end of the 1981 Policy period?

The FDIC argues that, regardless of whether notice was effective, its lawsuit is covered under the 1981 Policy, because of the discovery clause. The insurance contract provides that if the insurers cancel or refuse to renew the policy, the insured is entitled to purchase an additional year of coverage on the same policy terms and the insurer is obliged to inform the insured of this right. The FDIC argues that the Regulatory Exclusion changed the D & O policy so substantially that when the insurers inserted the Regulatory Exclusion into the 1984 Policy, they were "refus[ing] to renew" the 1981 Policy. Therefore, the FDIC claims, the insurers were under a contractual obligation to inform First Federal of its right to purchase a one year discovery period on the same terms as the 1981 Policy, without a regulatory exclusion. It further argues that, had it been offered the option, First Federal would have purchased such a discovery period rather than take the 1984 Policy terms. Finally, the FDIC argues that the appropriate remedy for this breach is to permit First Federal (or the FDIC acting as its successor-in-interest)

to purchase a discovery period *now* and provide notice to the insurers of the FDIC suit.

This argument turns on the definition of the term "refuse to renew" in the Discovery Clause, and whether the decision by the insurers to offer different coverage terms constituted a refusal to renew the 1981 Policy. The terms "renewal" and "refuse to renew" are not defined in the policy. The FDIC cites New Jersey cases holding that an insured is entitled to assume, unless given notice to the contrary, that the terms of renewal policy are the same as those of the original policy. *See, e.g., Bauman v. Royal Indem. Co.,* 36 N.J. 12, 174 A.2d 585 (1961).

In *Bauman,* the plaintiff held a general liability insurance policy written by the defendant, Royal Indemnity Company. The policy as originally issued provided coverage for injured residential employees not insured by a worker's compensation policy. The defendants issued a renewal policy that excluded employee coverage but failed to inform the plaintiff that the policy had been modified in any way. Shortly after the renewal policy was issued, a residential employee of Bauman's was injured. The insurance company denied liability in reliance on the exclusion contained in the renewal policy. The court held that under the circumstances the defendant would be bound by the terms of the earlier policy.

■ The FDIC argues that a logical extension of the *Bauman* rule is that when an insurer offers a renewal policy containing substantially different terms it is effectively failing to renew. We disagree. The holding in *Bauman* was explicitly based on the "elemental principle of business morality and decency" that an insured is unlikely to read a reissued insurance policy, and therefore "[a]bsent notification that there have been changes in the restrictions, conditions or limitations of the policy, the insured is justly entitled to assume that they remain the same." *Bauman,* 174 A.2d at 591–92. The court goes on to state that this holding does not lessen the insurer's "undoubted right, by appropriate alteration in the terms of its policies, to exclude such coverage in later renewals," so long as it adequately notifies the insured of the changes. *Id. Bauman*

does not support the extension argued for by the FDIC that a "renewal" cannot contain substantial changes in terms. Here, First Federal *was* given notice that the terms of the renewal policy were to be different than those of the previous policy, so *Bauman* is not applicable.

The FDIC also cites *McCuen v. American Casualty Co.,* 946 F.2d 1401 (8th Cir.1991), for the proposition that a refusal to provide the same coverage as was provided under the existing policy constitutes a refusal to renew. In that case, the insured was offered a policy with substantially narrower coverage but declined the renewal policy and sought the discovery period immediately. Another Eighth Circuit case, *American Casualty Co. v. FDIC,* 944 F.2d 455 (8th Cir.1991), held that where the insured *accepted* the new or different terms, as here, there was not a failure to renew. We read these cases together for the proposition that, under Iowa law, if an insurer offers to renew a policy only on substantially different terms, and the insured rejects these terms, the insurer is refusing to renew the policy. If on the other hand the insured is aware of the policy changes, and agrees to them, the policy has been renewed. Therefore, since First Federal accepted the renewal policy, the insurers did not "refuse to renew" the policy under the Eighth Circuit precedent.

■ In neither Eighth Circuit case, however, did the policy impose on the insurer an obligation to notify the insured of its right to purchase the discovery period. The FDIC argues that this contractual duty changes the result in this case. We disagree and hold that the insurers did not refuse to renew and, therefore, the bank's right to purchase a discovery period was not triggered.

3. The FDIC's arguments that notice was sent during the 1984 Policy period

As with the 1981 Policy, no formal notices of claims or potential claims were sent during the short 1984 Policy period, which lasted from June 26, 1984 until the insurers cancelled the policy in March of 1985. After cancellation, First Federal purchased a one year discovery period and, during that peri-

od, sent seven letters alerting the insurers that some individuals (not the FDIC) had potential claims against First Federal D & O's. *See supra* page 397.

This issue has been mooted by our previous decision in *FDIC v. Continisio*, Nos. 91–5107, 92–1720 (D.N.J. Sept. 11, 1992), in which we held that the Regulatory Exclusion in the 1984 Policy, if operative, specifically excludes coverage for suits by the FDIC, and by our decision today, explained below, that the exclusion is valid.

B. *Is The Regulatory Exclusion Void as Conflicting With A Federal Statute, 12 U.S.C. § 1729(f)(2)(A)(i), Which Permits the FSLIC to Purchase an Association's Assets?*

The FDIC argues that this court should not enforce the Regulatory Exclusion because the provision contravenes a federal statute. Specifically, the FDIC argues that the former FSLIC (the FDIC's predecessor-in-interest) purchased the assets of First Federal pursuant to a portion of the National Housing Act, 12 U.S.C. § 1729(f)(2)(A)(i) (1988) (repealed), which authorized the FSLIC to "purchase any ... assets" of a troubled thrift in order to facilitate a supervisory merger with a healthy thrift. The FDIC asserts that, pursuant to this statute, the FSLIC purchased (1) the claims First Federal once had against its Directors and Officers which are now being asserted in the underlying action; and (2) the claims First Federal would have had against the insurers for coverage under the D & O policies. The FDIC claims that enforcement of the regulatory exclusion contravenes the FSLIC's statutory right to purchase any assets of a failed thrift.

While the FDIC is correct that private contractual arrangements that contravene federal statutes are not to be given effect, the FDIC's argument fails because the Regulatory Exclusion does not contravene 12 U.S.C. § 1729(f). Section 1729(f) gave the FSLIC the authority to purchase any assets of a failing thrift, including its claims under its Directors and Officers insurance policies. However, as the insurers correctly point out, as of 1984, First Federal owned a Directors and Officers insurance

policy that contained a regulatory exclusion. The FSLIC purchased exactly the rights that First Federal had under that policy. Therefore, the regulatory exclusion does not contravene the statute authorizing the agency to purchase all the thrift's assets.

The cases cited by the FDIC do not impel a different conclusion. The FDIC cites *FDIC v. Bank of Boulder*, 911 F.2d 1466 (10th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1103, 113 L.Ed.2d 213 (1991), where the court held that a non-assignability provision in a letter of credit was unenforceable in the face of a federal statute, 12 U.S.C. § 1823(d) (1988), which granted the FDIC in its corporate capacity the right to purchase any assets from the FDIC as receiver of the failed bank. They also cite *NCNB Texas Nat'l Bank v. Cowden*, 895 F.2d 1488 (5th Cir.1990), where the court held the FDIC could transfer fiduciary appointments in trust agreements to a federally created bridge bank despite provisions in the trust agreements prohibiting such transfer, because a statutory grant of authority to the FDIC to transfer any assets of an insolvent institution to a federally created bridge bank overrode provisions to the contrary in the trust agreements. These cases are distinguishable from the present case, however, because they deal with an explicit conflict between a federal statute and the provisions of a contract. In *Bank of Boulder*, a statute that granted the FDIC the right to purchase all assets, including letters of credit, conflicted with a provision in a letter of credit that forbade sale. In *NCNB*, the conflict was between a federal statute empowering the FDIC to transfer assets and a trust provision that forbade transfer. Here, there is no such explicit conflict. The Regulatory Exclusion does not forbid the FSLIC or the FDIC from purchasing any assets from the failed bank: rather, it merely limits the asset itself, irrespective of who owns the policies or the rights under them. Therefore, there is no conflict and the FDIC's statutory argument fails.

This conclusion is consistent with a number of cases where the courts rejected a similar argument made by the FDIC based on a different statute. In a number of recent

cases dealing with the same insurance company and similar policies, the FDIC has argued that the Regulatory Exclusion contravened federal public policy because it interfered with the FDIC's statutory function to recover failed institutions' assets that were depleted by director and officer mismanagement. Almost without exception, the public policy argument was rejected by federal courts. This is because Congress, when enacting FIRREA, chose not to require banks to purchase Directors' & Officers' liability insurance and chose not to invalidate regulatory exclusions of the type at issue here. Therefore, Congress has not articulated the kind of clear and consistent public policy required to invalidate such an exclusion. *See, e.g., FDIC v. American Casualty Co.,* 975 F.2d 677 (10th Cir.1992); *Fidelity & Deposit Co. v. Conner,* 973 F.2d 1236 (5th Cir.1992); *St. Paul Fire & Marine Ins. Co. v. FDIC,* 968 F.2d 695 (8th Cir.1992); *American Casualty Co. v. Kirchner,* 1992 WL 300843 (W.D.Wis. May 22, 1992); *FDIC v. Continental Casualty Co.,* 796 F.Supp. 1344 (D.Or.1991).[9]

## IV. DIRECTORS' SUMMARY JUDGMENT MOTIONS

### A. Berenato Group's Arguments as to Estoppel and Actual Knowledge

Former directors Berenato, Small, Rodio, and Machise (the "Berenato Group") make two additional arguments as to why the 1981 Policy should cover the underlying FDIC suit. They argue (1) the insurers should be estopped from asserting the regulatory exclusion because of misrepresentation; and (2) the insurers' actual knowledge of bad loans made by First Federal, coupled with the absence of prejudice suffered by the insurers should satisfy the notice requirement of the 1981 Policy.

**9.** The Colorado Supreme Court recently invalidated an identical regulatory exclusion on the grounds that it violated state public policy because it inhibited the FDIC from exercising its statutory function of marshalling and distributing a failed bank's assets. *FDIC v. American Casualty Co.,* 843 P.2d 1285 (Colo.1992). While the Colorado court stated that "the validity of the regulatory exclusion in American Casualty Company's liability policy is not settled under federal banking law," its decision did not rest on federal

1. Should the insurers be estopped from denying coverage when they failed to inform the bank about the discovery option and inserted the regulatory exclusion after the 1981 policy had expired.

■ Under New Jersey law, an insurer may be equitably estopped from asserting defenses to a policy claim when (1) an insurer or its agent misrepresents the coverage of an insurance contract, and (2) the insured justifiably relies upon the misrepresentations to its detriment. *Harr v. Allstate Ins. Co.,* 54 N.J. 287, 255 A.2d 208, 218 (1969). The Berenato Group argues that "CNA made misrepresentations in the form of affirmative statements that First Federal's renewal would be on the same terms and conditions of the 1981 Policy and in the form of omissions as to the terms of the actual renewal," and therefore the rule of estoppel should apply.

The Berenato Group's estoppel argument fails because the directors cannot show either that the insurers made affirmative misrepresentations or that the bank reasonably relied upon such representations. The Berenato Group points to the following statements by the insurers' agent [10] as evidence of misrepresentation:

1. In September, 1983 (eight months before the renewal process), First Federal's president received notice from MGIC that MGIC was to be taken over by CNA, and that "the protection [we] previously enjoyed through Indemnity [MGIC] will be continued in the form of CNA."
2. In a notice dated November 1983 from CNA, First Federal was informed that "renewal policies will continue to be issued on MGIC Indemnity Policy Forms," and "as insurance departments approve CNA products, future renewal and new policies will be issued on CNA policies."

law at all, but instead rested on Colorado banking law. In this case, the FDIC did not make, nor do we reach, whether the exclusion violates any public policy of New Jersey.

**10.** The insurers argue that ABA should not be considered their agent for this purpose. We do not need to reach the issue since, even assuming agency, the elements of estoppel are not met.

3. On June 26, 1984 (the day the 1981 Policy was due to expire), ABA informed First Federal that "coverage is bound and continues.... [T]he same policy forms as MGIC apply."

4. The insurers failed to tell First Federal of its option to purchase a one year discovery period instead of accepting the renewal policy with the regulatory exclusion.

■■■■ The first statements do not rise to the level of an affirmative misrepresentation. The insurers never explicitly told First Federal that the renewal policy would be on the same terms as the 1981 Policy. The statement in #3 that "[T]he same policy forms as MGIC apply" comes the closest to being a representation that the policy would be unchanged, although characterizing that statement as a misrepresentation is a stretch of the policy language. In any event, any misunderstanding that the statement created was corrected within a week, since First Federal was informed on July 2 that the new policy would contain a regulatory exclusion. Therefore, the Berenato Group cannot show reasonable reliance, an element of their claim.

■■■■ The fourth alleged misrepresentation is not even a misrepresentation but an omission. Given our holding, *supra*, that the inclusion of the regulatory exclusion did not constitute a refusal to renew the policy absent a rejection by the insured of the new terms, the bank's rights under the discovery clause had not yet been triggered. Thus, the insurers had no duty to inform the bank of the option. Therefore, we reject the Berenato Group's estoppel claim.

2. Should the actual knowledge of the bad loans coupled with an absence of prejudice to the insurers satisfy the notice requirement under the 1981 Policy?

The Berenato Group also argues that the notice requirement in the 1981 Policy should not be strictly enforced. Specifically, the directors argue that since the insurers had actual knowledge during the 1981 Policy period of the wrongful acts that form the basis of the underlying FDIC action, the insurers should not be able to rely on the lack of formal notice to deny coverage unless they can show prejudice resulting from the lack of formal notice. This argument is based upon New Jersey cases that have held that notice provisions in insurance contracts are not to be strictly enforced, and that failure to comply with them will only forfeit coverage when the insurer can show prejudice.

■■■ New Jersey courts have, however, limited this rule to occurrence policies, and have explicitly refused to extend this rule to claims made policies. *See Zuckerman v. National Union Fire Ins. Co.*, 100 N.J. 304, 495 A.2d 395 (1985). The *Zuckerman* court distinguished a "claims-made" from an "occurrence" policy on the following basis:

> [T]he requirement of notice in an occurrence policy is subsidiary to the event that invokes coverage, and the conditions related to giving notice should be liberally and practically construed.

> By contrast, the event that invokes coverage under a "claims made" policy is transmittal of notice of the claim to the insurance carrier.

*Id.*, 495 A.2d at 406.

Applying the reasoning of the New Jersey Supreme Court to this case, allowing the bank coverage under the 1981 Policy, though it failed to comply with the notice provision, would give the insured an unbargained-for expansion of coverage. *See id.*

The Berenato Group argues for an extension of the notice-prejudice rule to this case because the language of the policy at issue here is similar to an occurrence policy. We must reject this argument because the notice provision in the First Federal policy is nearly identical to the provision at issue in *Zuckerman*, which the New Jersey Supreme Court held to be a claim-made policy. *Id.* at 397; *see also Samuel N. Zarpas, Inc. v. Morrow*, 215 F.Supp. 887, 888 (D.N.J.1963). Therefore, we hold that the insurers need not demonstrate that they were prejudiced by the insured's failure to give notice in order to defeat coverage.

B. *Continisio and Caruso*

Directors Nicholas Continisio and Joseph Caruso have submitted short letter briefs in

which they raise additional arguments as to why summary judgment should not be granted to the insurers.

■■■■■ Caruso argues that, under New Jersey law, insurance contracts are to be interpreted in accordance with the objectively reasonable expectations of the insured. He argues that he was not privy to the process of obtaining coverage for employees of the bank, that he asked representatives of First Federal if coverage was available, and that he reasonably believed that he would be insured under the policy for all claims that arose from actions that were committed during the policy period. He concludes that, under the reasonable expectations doctrine, he should therefore be covered in accordance with these expectations. The insurers argue in response that (1) while Caruso may have expected that he would be covered by the D & O policy, that expectation was unreasonable, given the clear language of the policy; and (2) the insurers should not be bound by First Federal's statements to its employees regarding coverage. The insurers are correct on both counts. Under New Jersey case law, an insured is considered to be on notice of the clear and unambiguous provisions of its insurance contract. *Bauman v. Royal Indem. Co.,* 36 N.J. 12, 174 A.2d 585 (1961). Furthermore, while a court must construe a policy of insurance to conform to the objectively reasonable expectations of the insured, it may not rewrite the policy terms to provide coverage where there would otherwise be none. *Walker Rogge, Inc. v. Chelsea Title & Guaranty Co.,* 116 N.J. 517, 562 A.2d 208 (1989).

■■■■■ Continisio argues that the rule that ambiguities in a contract of insurance are to be construed in favor of the insured is reinforced by the strong public policy interest in favor of spreading the risk of the savings and loan bailout. While this argument might have some merit if the provision was ambiguous, we cannot use the savings and loan crisis to find coverage beyond the clear terms of the policy. *See supra* pages 400–01; *FDIC v. Continisio,* Nos. 91–5107, 92–1720 (D.N.J. Sept. 11, 1992).

## V. THE BERENATO GROUP'S CROSS-MOTION FOR JUDGMENT ON THE ISSUE OF ADVANCEMENT OF FEES

The Berenato Group has filed a separate summary judgment motion on the issue of advancement of fees. This motion seeks an order from this court compelling the insurers to pay all expenses incurred in defending the underlying litigation up until this point, and to pay all invoices for future expenses within thirty days of presentation. They also seek attorneys fees in this declaratory judgment action under New Jersey Court Rule 4:42–9(A)(6). For the reasons stated below, and because we are granting summary judgment to the insurers, the directors' motion will be denied in its entirety.

### A. *Are the Directors Entitled to an Advancement of Fees Expended in the Underlying FDIC Litigation?*

The Berenato Group argues that under *Little v. MGIC Indem. Corp.,* 836 F.2d 789 (3d Cir.1987), they are entitled to have the insurers advance to them the cost of defending the underlying FDIC action. *Little* was a declaratory judgment action brought by a former bank director against MGIC, the insurer of the bank's D & O insurance policy, seeking a declaration that MGIC was required under the policy to pay Little's defense costs as they came due. MGIC argued that its obligation to pay Little's defense cost arose, if at all, only after disposition of the claims against him. The Third Circuit, analyzing a policy identical in all relevant respects to the policy at issue here, held that the policy required the insurer to advance the costs of defense as the director became liable for them, subject to a conditional right to reimbursement if the wrong committed did not fall within the scope of the insurance coverage.

The disposition of the summary judgment motions above moots this claim. *Little* only requires insurance companies to defend pending a judicial determination of the insured's right to coverage. Since we have held that the insured is not covered by the plaintiffs' insurance policies, there is no requirement to either defend or to advance

fees. Therefore, the directors' motion for advancement of fees will be dismissed.

B. *Are the Directors Entitled to Attorney's Fees Expended in Defending This Coverage Suit?*

 The Berenato Group also argues that under N.J. Court R. 4:42–9(a)(6), they are entitled to attorney's fees they have expended in this declaratory judgment coverage suit. Rule 4:42–9(a)(6) allows a *successful* claimant who institutes a declaratory judgment action against an insurer to recover attorneys fees.[11] Since, under our decision on the insurers' motion for summary judgment, the directors are *unsuccessful* claimants under the insurance policies; the directors would not be entitled to fees even assuming the New Jersey law applies.

### CONCLUSION

For the reasons articulated above, plaintiffs' motion for summary judgment is granted; the FDIC's and directors' cross-motion for partial summary judgment is denied; Andrew G. Berenato, John Machise, James N. Rodio and Robert E. Small's motion for summary judgment on advancement of fees is denied; Nicholas Continisio's motion for a stay or dismissal is denied; and plaintiffs' motion seeking sanctions against Nicholas Continisio is also denied. The accompanying order has been entered.

### ORDER

This matter having come before the court upon cross-motions for summary judgment, and the court having considered the submissions of the parties, and for good cause shown;

It is, this 30th day of March, 1993, hereby ORDERED that plaintiffs American Casualty Company of Reading Pennsylvania and Continental Casualty Company's motion for summary judgment is GRANTED; defendants Federal Deposit Insurance Corporation, Nicholas Continisio, Joseph Caruso, Andrew G. Berenato, John Machise, James N. Rodio, and Robert E. Small's cross-motion for summary judgment is DENIED; defendants Berenato, Machise, Rodio, and Small's motion for summary judgment on the issue of advancement of fees is DENIED; defendant Continisio's motion to dismiss or stay is DENIED; and plaintiffs' motion for sanctions against Continisio is also DENIED.

---

11. Rule 4:42–9 provides in relevant part:
 **(a) Actions in Which Fee is Allowable.** No fee for legal services shall be allowed in the taxed costs or otherwise, except

. . . .

(6) *In an action upon a liability or indemnity policy of insurance,* in favor of a successful claimant.