LOUIS MAZZILLI, PLAINTIFF-RESPONDENT, v. ACCIDENT
& CASUALTY INSURANCE COMPANY OF WINTERTHUR,
SWITZERLAND, DEFENDANT-APPELLANT.

Argued February 20, 1961—Decided May 8, 1961.

*Mr. Robert C. Gruhin* argued the cause for plaintiff-respondent.

*Mr. James P. Beggans* argued the cause for defendant-appellant.

The opinion of the court was delivered by

FRANCIS, J.  The issue presented here requires a construction of the clause of a liability insurance policy which extends coverage to a spouse of the named assured if she

is a resident member of the household. At a trial in the Superior Court, Law Division, a jury determined on the facts that she qualified as such resident. The insurer, Accident & Casualty Insurance Company, appealed and we certified the matter before it was heard in the Appellate Division.

The saga of the case in the courts is a long one. It may be traced in *Mazzilli v. Selger,* 23 *N. J. Super.* 496 (*App. Div.* 1952); 11 *N. J.* 593 (1953); 13 *N. J.* 296 (1953); *Mazzilli v. Accident & Cas. Co., etc.,* 45 *N. J. Super.* 137 (*App. Div.* 1957); 25 *N. J.* 54 (1957); 26 *N. J.* 307 (1958).

Recital of the facts relevant to this proceeding is necessary in order to bring the problem into understandable focus. Adam and Frances Selger were married on October 3, 1937. A son, Kenneth, was born of the marriage in 1939. In 1944 Selger acquired a 2.46-acre tract of land on Cedar Avenue in Secaucus, New Jersey. Title was taken in the name of a corporation, but this was later held to be a device to avoid his wife's dower right. The property was shown on the tax map as Lot 2A, Block 50, on Cedar Avenue. It was not identified there by a specific street number. A four-room bungalow located on the tract became the Selgers' home in November 1944. Selger gave this house the number 836 Cedar Avenue for mail purposes because the next house on the street was 834. The family consisted of Adam, Frances, their son Kenneth, and one Jack Phillips, a son of Mrs. Selger by a former marriage.

Either before they moved into the bungalow (for which Adam Selger provided the furniture) or soon thereafter, they made plans to build another house for themselves on the property. In December 1945, however, before it was finished, Selger separated from his wife and son. Upon completion sometime in 1947, he moved into the new house which was 150 feet away from the bungalow. No separate lot was established for the new building; no lot lines were ever marked out on the tax map or otherwise; no fence or other physical boundaries were created. The 2.46-

acre tract remained as a unit which contained the two houses. According to Mrs. Selger, about a year after Adam began occupancy of the new building, he arbitrarily took the street number 836 Cedar Avenue which had been used for their home since 1944 and bestowed it on the house he was occupying. At the same time he redesignated the bungalow as 880 Cedar Avenue. Selger's recollection as to when this transfer took place was not clear. He remembered moving into the new house in 1947 and that both houses had the same street number for a time; whether for six months, he could not recall.

Selger did not live in the bungalow with his wife after December 1945. She remained there with their son who apparently had the freedom of both places. Selger testified that he took care of Kenneth on many occasions; that he was "in and out," and that this was "all one place where the entire family was living." He provided and maintained the bungalow where Mrs. Selger continued to live and he supported her and Kenneth there until long after the incident which produced this litigation.

In the latter part of 1947 Mrs. Selger instituted an action for separate maintenance for herself and for support for Kenneth, and to have her dower interest declared in the premises on which they were both living, as well as in some other properties of her husband, title to which had been taken in corporate names. *Pendente lite* monetary relief was granted and in addition Selger was directed to continue providing the bungalow and the fuel for heating it for his wife and son. No specific order was made granting custody of Kenneth to his mother. He is referred to in the support order as "in her custody." It seems obvious that no need existed to deal expressly with the matter of visitation rights by the father. The boy was with his mother, just 150 feet away in the bungalow, and Selger had ready access to him at all times. The companionship of the boy and his father was not a source of controversy. It is reasonable to say from the record that Selger was content to have his son

cared for by the mother and to maintain them both on the premises in close proximity where he could observe that care, and exercise a measure of supervision and influence over him.

Some time prior to April 21, 1949, plaintiff Louis Mazzilli was engaged by Selger to rebuild a fence for his horse corral at "836 Cedar Avenue." It is perfectly clear that this address was considered by Selger as descriptive of the entire tract and was not limited to his house and the area immediately surrounding it. Although the full dimensions and location of the fence are not disclosed by the record before us, it does appear that at the time of the incident resulting in *Mazzilli's* injury he was working on a portion of the fence close to the rear of the bungalow occupied by Mrs. Selger and Kenneth.

On April 21, 1949 Kenneth, who was then not quite ten years of age, obtained a shotgun belonging to his half-brother and fired it at Mazzilli out the bedroom window, seriously wounding him. As a consequence, Mazzilli later obtained a $10,000 verdict against Mrs. Selger because of her negligence in leaving the gun where it was accessible to a child of such immature years.

On May 20, 1947 Adam Selger had obtained from defendant Accident & Casualty Insurance Company a contract of liability insurance, described therein as a "Comprehensive Single Limit Personal Liability" policy. The period of coverage was three years—until May 20, 1950—and during that period the insurer agreed to pay "on behalf of the insured all sums which the insured shall become obligated to pay by reason of the liability imposed upon him by law * * * for damages * * * because of bodily injury * * * sustained by any person * * *." The policy contains a number of specific exclusions from coverage listed under the title "Exclusions." But it also contains under the caption "Insuring Agreements" a broad inclusory clause extending the protection to persons other than the named insured. Under that provision the coverage is extended to

include the named assured's "spouse and relatives and wards
of either" if "residents of the household." Such persons
are insured against the consequences of their negligent acts
or omissions "anywhere in the world."

The policy is curiously hybrid in nature. Although it
covers the named and additional insureds anywhere in the
world, it seems to provide specific protection also against
damages imposed by law arising from negligence in the
operation or maintenance of certain premises. The declara-
tions contain the "description of premises where *any* Insured
maintains a residence" as "836 Cedar Ave., Secaucus, New
Jersey." (Emphasis added) They say also that the number
of *residence* employees of all Insureds hereunder is not over
two, and that "No Insured maintains a residence  *  *  *
at any other premises." Residence employee means "an
employee whose duties are incidental to the ownership,
maintenance or use of the premises, including the mainte-
nance or use of automobiles or teams, or who performs duties
of a similar nature not in connection with the Insured's
business." 'Premises are defined as "all premises where the
Named Insured or his spouse maintains a residence and
includes garages and stables incidental thereto and indi-
vidual or family cemetery plots or burial vaults  *  *  *."
The impression gained from a reading of the entire contract
is that the insurer undertook to blend into one instrument
a general public liability premises policy and a comprehen-
sive personal liability policy.

The premises where any insured maintained a residence
are described as 836 Cedar Avenue. The record is anything
but clear as to whether on May 20, 1947 that address related
to both the new house and the bungalow or had been taken
over by Selger for the new house and 880 Cedar Avenue
assigned arbitrarily by him to the bungalow. In any event,
he owned the entire tract or premises as a unit, and we
have no doubt (as in fact counsel for the carrier concedes)
that an accident happening anywhere thereon as the result
of negligence chargeable to Selger would be within the ambit

of the policy. As has been noted above, when Mazzilli was injured he was working in close proximity to the bungalow. No one suggests that he was not on the insured premises at the time.

Thus we are brought to the crucial question in the case: At the time of the accident was Mrs. Selger a "resident of *the* household" under the circumstances disclosed? (Emphasis added) If so, the defendant carrier is responsible for the payment of the judgment against her. The carrier maintains that the phrase "resident of the household" is susceptible of but one connotation, *i. e.,* that the person claiming coverage as such a resident must live under the same roof as the named assured. On the other hand plaintiff asserts that the phrase is legitimately open to a broader interpretation which would qualify a member of the family as such a resident even though the same roof did not cover their heads.

██ Solution of a problem of construction of an insurance policy must be approached with a well settled doctrine in mind. If the controlling language will support two meanings, one favorable to the insurer, and the other favorable to the insured, the interpretation sustaining coverage must be applied. Courts are bound to protect the insured to the full extent that any fair interpretation will allow. *Kievit v. Loyal Protective Life Ins. Co., etc.,* 34 *N. J.* 475 (1961). Moreover, in evaluating the insurer's claim as to the meaning of the language under study, courts necessarily consider whether alternative or more precise language, if used, would have put the matter beyond reasonable question; also whether judicial decisions appear in the reports attributing a more comprehensive significance to it than that contended for by the insurer. *Mahon v. American Cas. Co. of Reading, Pennsylvania,* 65 *N. J. Super.* 148 (*App. Div.* 1961). Insurance contracts are unipartite in character. They are prepared by the company's experts, men learned in the law of insurance who serve its interest in exercising their draftsmanship art. The result of their effort is given to the

insured in printed form upon the payment of his premium. The circumstances long ago fathered the principle that doubts as to the existence of coverage must be resolved in favor of the insured. *Barker v. Iowa Mut. Ins. Co.,* 241 *N. C.* 397, 85 *S. E. 2d* 305 *(Sup. Ct.* 1955).

These general rules of construction have spawned a number of subsidiary ones of equally universal recognition. For example, where the policy provision under examination relates to the inclusion of persons other than the named insured within the protection · afforded, a broad and liberal view is taken of the coverage extended. But, if the clause in question is one of exclusion or exception, designed to limit the protection, a strict interpretation is applied. *Cal-Farm Ins. Co. v. Boisseranc,* 151 *Cal. App. 2d* 775, 312 *P. 2d* 401, 405 *(D. C. App.* 1957).

Household is not a word of art. Its meaning is not confined within certain commonly known and universally accepted limits. True, it is frequently used to designate persons related by marriage or blood, who dwell together as a family under a single roof. *Neidhoefer v. Auto. Ins. Co. of Hartford, Conn.,* 182 *F. 2d* 269, 272 *(7 Cir.* 1950); 35 *C. J. S., Family, pp.* 936, 937. But it has been said also that members of a family need not in all cases reside under a common roof in order to be deemed a part of the household. See *Fay v. John Waldron Corp.,* 117 *N. J. L.* 123 *(Sup. Ct.* 1936); *Central Mfrs.' Mut. Ins. Co. of Van Wert, Ohio v. Friedman,* 213 *Ark.* 9, 209 *S. W. 2d* 102, 1 *A. L. R. 2d* 557 *(Sup. Ct.* 1948); *Cal-Farm Ins. Co. v. Boisseranc, supra,* 112 *P. 2d,* at *p.* 406. Lexicographers and encyclopedias suggest that the word encompasses persons who live in one house or within the same curtilage, or upon the same premises. *Bouvier's Law Dictionary (Baldwin's Century Edition* 1948) 510; *Cyclopedic Law Dictionary (Shumaker & Longsdorf* 1901) 447; 35 *C. J. S., Family, p.* 938. Although "household" is treated in many contexts as synonymous with "family," it is generally regarded as of more comprehensive significance, *i. e.,* as including servants and

attendants. *Engebretson v. Austvold,* 199 *Minn.* 399, 271 *N. W.* 809 *(Sup. Ct.* 1937). And in the absence of clear expression to the contrary, household servants employed in the home include those who live on the premises but not in the main house, and those who work on the grounds as well as those whose duties are confined to the interior. *In re Savin's Estate,* 131 *N. J. Eq.* 563 *(Prerog.* 1942), affirmed *sub nom. Campbell v. Willard,* 133 *N. J. Eq.* 279 *(E. & A.* 1943).

In this connection a Federal District Court recently made a sage observation:

"The involvements and complexities which underlie the marriage relationship do not lend themselves to rigid and dogmatic interpretation. To limit the evaluation of whether husband and wife were living together in one household to sole consideration of living under one roof is, in my judgment, unduly restricting and giving shallow effect to the meaning and significance of the sanctity of marriage vows." *Boyd v. Folsom,* 149 *F. Supp.* 925, 927 *(D. C. W. D. Pa.* 1957), affirmed 257 *F. 2d* 778 (3 *Cir.* 1958).

We have discovered no cases directly in point with the present one. It does appear, however, from cases wherein the courts were required to appraise the outer limits of "household," that when some benefit would accrue to a member of the family by a broad construction, such view was adopted. This seems to have been particularly true where the right to the benefit was being contested on the ground that the claimant did not live under the same roof and therefore was not a member or resident or part of the household. For example, for homestead exemption purposes, *Woodward v. Murray,* 18 *Johns.* 400, 6 *N. Y. Common Law Rep.* 632 *(Sup. Ct.* 1820); social security benefits, *Boyd v. Folsom, supra;* workmen's compensation benefits, *Fay v. John Waldron Corp., supra;* and clauses *extending* insurance benefits, *Central Mfrs.' Mut. Ins. Co. v. Friedman, supra; Cal-Farm Ins. Co. v. Boisseranc, supra; Olson v. Standard Marine Ins. Co.,* 109 *Cal. App. 2d* 130, 240 *P. 2d* 379 *(D. C. App.* 1952); *Barker v. Iowa Mut. Ins. Co., supra; Raymond v.*

*Century Indem. Co.*, 264 *Wis.* 429, 59 *N. W. 2d* 459 (*Sup. Ct.* 1953).

In *Fay*, a workmen's compensation case, the employee involved lost his wife by death. After her death he and his two minor children went to live with his sister. Thereafter the sister married and moved to another municipality, taking the children with her. The employee-father found employment in a different city. It being inconvenient for him to stay at his sister's home, he lived in a small hotel at his place of work and came to his sister's on week-ends, where he kept clothes and personal effects. He bought his children's clothes and other necessities and contributed to their support. He suffered a fatal industrial accident and the issue arose in the workmen's compensation case as to whether the children qualified under the statute as conclusively presumed dependents because they were "actually a part of [his] household at the time of his death." The former Supreme Court held that under the circumstances it was not necessary for the children to be under the same roof as their father in order to meet the statutory condition. Chief Justice Brogan said that "The place of abode might lack some of the formal concomitants that usually are found in a home, and still, * * * be one's household." At *p.* 127 of 117 *N. J. L.*

In *Boyd* the husband and wife had been previously married, and each had children by the former marriages. They had two children by their union (one posthumously). Although the husband and wife were compatible, the children by their first marriages could not live in harmony. Conditions in the home became unbearable and by mutual agreement the husband established two homes. He moved into one with his children; she took the other with her children. He supported both establishments to the best of his ability and visited her regularly. In fact, his death occurred while he was in her home. Under the Social Security Act, to be entitled to benefits it was necessary to establish that they both were members of the same household at the time of

his death. The court declared that although they were not at all times living physically in the same abode, they were living with each other in the same household within the spirit and substance of the statutory requirement.

In *Woodward v. Murray,* the husband absconded from the state leaving his wife and children living in the house they had been occupying with him. Sometime later when they were in the course of moving a few miles away to the wife's father's home, a levy on a judgment against the husband was made on their effects, which were owned by the husband. The wife's claim of the husband's exemption as a householder was sustained. Even though he had absconded and she and the children were moving to another home, not provided by him, the court said, "They were his household and he was the 'householder.' "

The insurance cases cited above are particularly noteworthy. In *Cal-Farm Ins. Co. v. Boisseranc,* the facts revealed that the named insured, Boisseranc, was married and had minor children. In 1949, while he and his wife and children were living together in the same house, he obtained a comprehensive personal liability policy (substantially like the one involved in this case) which covered him and "if residents of *his* household, his spouse and relatives * * *." 151 *Cal. App. 2d* 775, 312 *P. 2d* 402] It should be observed that Boisseranc's policy was more specific than Selger's which extends the protection to his spouse and relatives "if residents of *the* household"—a somewhat more general expression. (Emphasis added) Subsequently a separation arose. Two of the children, including the son, James, who caused the accident in question, went to live with their mother. In February 1953 the wife obtained an interlocutory decree of divorce. Prior to the accident the parties were given joint custody of James with the provision that his "physical residence" would be with his mother and that the father would have the right of visitation at all reasonable times, including visitation by James in his (the father's) home. The evidence showed that James spent more than

half the time with his father. When the school year ended in June he stayed with his mother for a few days, then returned to his father's home and remained there until about the end of the third week in August 1953, when he came back to his mother. On September 1, 1953, while living with his mother, he injured another child. The insurer disclaimed responsibility on the ground that James was not a resident of his father's household. Support for its position was placed on the divorce decree which provided for the "physical residence" of the boy with his mother, and on the fact that he was living with his mother when the mishap occurred.

The court declared that the divorce decree was not conclusive and held that the problem was one of fact, not one of law because the phrase "if residents of his household" requires some explanation *dehors* the contract. The words were said to have no absolute meaning but rather one which may vary according to the circumstances, and if any reasonable doubt existed as to the extent or fact of coverage, whether as to peril insured against the amount of liability, or the persons protected, the language will be understood in its most inclusive sense, for the benefit of the insured. The opinion goes on:

"One purpose of the extension of coverage clause is to broaden the coverage of the named insured. * * * [The father], when he took out the policy, was potentially liable for the torts of his minor children under proper circumstances. Thus, the extension of coverage to 'relatives' protects * * * the named insured, as well as protecting the relatives. Another purpose of the extended coverage provision was to assist the insured * * * [the father] in complying with his moral and legal obligation to maintain and support his family. It is of some significance that the policy does not contain any itemization of the persons covered, specifying only the named insured * * * and his partner, and the insured premises. The premium payments were not based upon the number of relatives living on the premises." 312 *P.* 2d, at *p.* 405.

After pointing out that there are cases holding that in interpreting such clauses the physical place where the claimed insured was living is not necessarily controlling and that

under the facts the child had a continuing relationship with his father so far as residence is concerned, the court concluded that:

"In view of the purpose of such policies already discussed, and the rules of construction applicable to such policies, it must be held that the finding of the trial court on the issue is supported." *Id.*, at *p.* 406.

We realize, of course, for reasons which need not be detailed here, that the issue whether Kenneth Selger, the named insured's son, was a resident of the household, is not before us and cannot be considered. The relevance of the cited case, however, with respect to the status of Mrs. Selger is obvious.

*Central Mfrs.' Mut. Ins. Co. v. Friedman* involved a floater policy insuring certain personal property in case of theft. It covered the named insured and "members of the Insured's family of the same household" against such loss whether the property was at home or elsewhere. The insured's minor son, who normally lived with him, was drafted and while he was stationed at Fort Eustis, Virginia, his locker was broken into and articles were stolen therefrom. Proof was introduced to show that upon discharge from the Army the son would return home. Holding that it was not necessary for persons to be living under the same roof to be a "member of the Insured's family of the same household," [213 *Ark.* 9, 209 *S. W. 2d* 103] and that on the facts the son qualified as such, the Supreme Court of Arkansas sustained the judgment against the insurer. See also, *Raymond v. Century Indem. Co., supra; Senn v. State Farm Mut. Auto. Ins. Co.,* 287 *S. W. 2d* 439 (*Ct. App.* 1956).

In *Barker v. Iowa Mut. Ins. Co.,* the subject of the controversy was a fire insurance policy. The coverage included the personal property of the named insured and "any member of the family of and residing with, the insured, while elsewhere than on the described premises." [241 *N. C.* 397, 85 *S. E. 2d* 306] A married minor son and his wife lived

at home with the insured when the policy was issued. Subsequently the son entered North Carolina State College and his father provided an apartment in the college community for him and his wife during the school term. Fire destroyed some of their personal effects and the company refused to pay on the ground that they were not residing with the insured at the time. The contention was rejected on the theory that, under the required liberal interpretation of the language used, the temporary abode of the young people did not take them out of the category of persons residing with the insured.

In *Olson v. Standard Marine Ins. Co.,* the policy protected certain itemized personal property against theft. It covered the named insured, a resident of San Francisco, and "members of his or her family of the same domicile." [109 *Cal. App. 2d* 130, *240 P. 2d* 381] Some of the described articles were stolen from the apartment of a daughter in Los Angeles. The policy was declared applicable because the trial court found that the daughter, although then living in Los Angeles, did not intend to relinquish her residence with her mother (the named insured) in San Francisco.

These cases demonstrate that the term "household" or "resident of the household" cannot be so limited and straitjacketed as always to mean, regardless of facts and circumstances, a collective body of persons who live in one house. Application of their principles to the present case leads us to the view that it cannot be said as a matter of law that Mrs. Selger was not a resident of "the household" because she did not live under the same roof as her husband.

▮ Selger was the owner of the 2.46-acre tract on which both dwellings were situated. It constituted the "premises" insured. Injuries suffered by his invitee anywhere thereon because of a defective condition chargeable to him, whether or not created by him, would be within the policy protection. Such liability could arise from dangerous or defective conditions, known to Selger and unremedied after reasonable notice, even though caused by Mrs. Selger or Kenneth.

Mr. and Mrs. Selger were husband and wife. Although he had separated from her, except for a short period, he continued to live on the premises in another home and permitted her to remain in occupancy of their matrimonial home. He could have provided accommodations for her off the premises or could have paid her a sufficient amount for support and maintenance of herself and their son to make it possible for her to reside elsewhere in accordance with the station in life they enjoyed during their marital cohabitation. But she and Kenneth remained in the bungalow, just 150 feet away from his new house, and he supported them there, and maintained the bungalow, providing the fuel for heating, etc. The record contains no showing that he ever objected to or opposed keeping them in such close proximity. No physical barriers of any kind were established to interfere with their free movement about the tract. There was nothing to prevent Selger from visiting his wife if he wished. In fact, since he had abandoned her in the legal sense, if he desired to avoid becoming such a deserter as would justify a divorce judgment against him, he had the duty of seeking her out and proposing a resumption of their life together. The law looks with favor upon reconciliation and encourages any situation which may be conducive to that end. Moreover, the bungalow being his property he was entitled to enter at reasonable times for inspection or repair purposes. But of primary significance was his feeling that "this (meaning the premises) was all one place where the entire family was living" and being maintained by him.

Especially meaningful in the factual context is the relationship between Selger and his son Kenneth. There was no specific award of Kenneth's custody to either parent in the maintenance proceedings. He was living with his mother, being supported by his father, and obviously the father and son familial and physical proximity was such that the parents did not regard it as necessary to seek any court mandate with respect to custody or visitation. In such a situation both parents had the equal right to his custody. *N. J. S. A.*

9:2-4. Apparently Selger was satisfied to have the boy in his mother's physical possession so long as harmony existed with respect to her care of him and Selger's unlimited privilege of access and visitation.

The conclusion is inescapable that father and son were close in personal relations as well as physical proximity and that the boy had the run of the place. According to Selger, Kenneth was "in and out" and he took care of him on many occasions. It is a fair inference that the father wanted the boy on the premises and that he realized the way to accomplish that result was to have his wife remain in the bungalow and take care of him there. Keeping her in the bungalow retained the intimate family contact to the extent that he desired, and undoubtedly explains why he considered the premises "all one place where the entire family was living." If, instead of continuing his wife in the bungalow, Selger had engaged a housekeeper or a baby sitter to live there and care for his son, obviously such person would be a resident of the household. There can be little doubt that Mrs. Selger, as his spouse and Kenneth's mother, served his devotion to Kenneth and his objective in having the boy on the premises infinitely better than any stranger to the family could have done. The unfortunate circumstance of lack of husband and wife cohabitation, when assayed in the light of the total picture, might well be considered insufficient to wrench Mrs. Selger from *the* household. Under all the circumstances it is not unreasonable to conclude that both dwellings constituted "the" household and that parents and son were residents of it within the contemplation of the insurance policy. As has been said, there is no absolute requirement in the law that members or residents of the household must live under a common roof. If the insurer wished to impose such a restriction it would have been a simple matter to do so by express language. Failure to be explicit in that regard makes it the duty of the court to adopt the construction which favors extension of coverage. In view of the state of the law with respect to the definition

of household, it was proper for the trial court to call upon the jury to decide whether on the facts Mrs. Selger qualified as a resident of the household. No suggestion is made that the finding is contrary to the weight of the evidence.

Defendant relies in large measure upon five cases in other jurisdictions: *Neidhoefer v. Automobile Ins. Co. of Hartford, Conn., supra; Hartford Acc. & Indem. Co. v. Casualty Underwriters,* 130 *F. Supp.* 56 (*D. C. Minn.* 1955); *Kohner v. National Sur. Co.,* 105 *Cal. App.* 430, 287 *P.* 510 (*D. C. App.* 1930); *Milwaukee Mechanics' Ins. Co. v. Heffernan,* 121 *Ohio St.* 499, 169 *N. E.* 573 (*Sup. Ct.* 1929); *Fleming v. Travelers Ins. Co.,* 206 *Miss.* 284, 39 *So. 2d* 885 (*Sup. Ct.* 1949). In all of these cases the facts are substantially different. In *Hartford Acc. & Indem. Co.* the parents of the young man who was driving the insured automobile (owned by his father) had been separated for six years. The father resided and worked in Wisconsin, the mother and children lived in Minnesota. The son involved in the accident lived with his mother, except when away at school. Occasionally he visited his father for a day or two in Wisconsin. It was held that these few visits did not make him a member of his father's household.

In *Neidhoefer* a theft policy had been issued to the husband covering personal property owned by him or a member of his family of the same household. About three months before the loss the wife left her husband and took up a separate abode in another part of the city. The articles in question owned by her were taken from her apartment. In denying recovery on the ground that she was not a member of her husband's family of the same household, the court pointed out that the evidence plainly indicated that she had left her husband with the intention of permanently separating from him.

*Fleming v. Travelers Ins. Co.* concerned the applicability of the omnibus clause of an automobile liability policy which provided coverage for the insured when driving a car other than that described in the policy, unless the car was owned

by a member of the named assured's household. At the time of the accident in question, the husband was driving his wife's automobile. How he obtained it does not appear. He and his wife had been separated for about five years. She resided in New Orleans, Louisiana, in a house owned by him and he furnished some support for her. He lived in Mobile, Alabama, with another woman by whom he had had two children and whom he had represented as his wife for some time prior to the accident. This woman was a passenger in the car, suffered injury and was the claimant in the policy suit. The Supreme Court of Mississippi declared that "household" cannot be satisfactorily defined as an abstract term, and that "definition by lexicon supplies elements which are seized upon by opposing interests, and isolated from other factors furnish material relevant to contradictory conclusions." [206 *Miss.* 284, 37 *So.* 2d 887] But on the facts it was adjudged that the wife was not a member of her husband's household, and therefore the insurer was liable.

*Milwaukee Mechanics' Ins. Co. v. Heffernan* was relied upon as authority in *Fleming.* There the insurer had issued an automobile theft policy which excluded coverage if the car was stolen by a person in the insured's household. The wife was the insured. She had been living apart from her husband for more than a year, and had unsuccessfully sued him for divorce. She did, however, obtain an order for the support of herself and their children, and she was given custody of the children. Five months after this order, the husband stole the wife's insured car. The carrier was held responsible because he was not a "person in [her] household." [121 *Ohio St.* 499, 169 *N. E.* 574]

Finally, in *Kohner v. National Sur. Co.,* a theft policy covering jewelry was the subject of the litigation. It had been issued to a husband and applied to all property owned by him, "or by any permanent member of the household of the assured who does not pay board or rent, or by a relative of the assured permanently residing with him * * *."

[105 *Cal. App. 2d* 430, 287 *P.* 514] Husband and wife lived in a home owned by her. The wife sued the husband for divorce and obtained an order restraining him from entering her home. In obedience to the restraint, he moved out and took up residence elsewhere. Six days later her home was entered and her jewelry stolen. She was denied the benefits because she did not qualify as an insured within the conditions of the policy.

Mere recital of the facts in those cases distinguishes them. None has the elements of continuance of a substantially integrated family relationship that are present here. For that reason, we reiterate, Mrs. Selger was reasonably found to be a resident of the household within the scope of defendant's contract of insurance.

Affirmed.

*For affirmance*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, HALL, SCHETTINO and HANEMAN—6.

*For reversal*—None.