862 A.2d 560 (2004)
373 N.J. Super. 480
CUSTOMIZED DISTRIBUTION SERVICES, Plaintiff-Appellant,
v.
ZURICH INSURANCE COMPANY and Campbell Soup Company, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued October 19, 2004.
Decided December 16, 2004.
*561 Kenneth R. Rothschild, Bridgewater, argued the cause for appellant (Golden, Rothschild, Spagnola, Lundell, Levitt & Boylan attorneys; Mr. Rothschild, of counsel; Julia C. Talarick, on the brief).
William J. Schmidt, Pennsylvania, PA, argued the cause for respondent (White and Williams, attorneys; Edward M. Koch, on the brief).
Before Judges KESTIN, ALLEY and FALCONE.
The opinion of the court was delivered by
ALLEY, J.A.D.
In June 2000, Campbell Soup Company (Campbell) filed a complaint against Customized Distribution Services, Inc. (CDS) which operated a warehouse in Wharton, New Jersey. The claim arose from the warehousing of a Campbell beverage product named "Splash." According to Campbell, CDS failed to rotate and ship the Splash in a timely manner and was liable for Campbell's resultant damages, including those flowing from Campbell having to dispose of the product at reduced prices.
CDS sought insurance coverage for the claim from its insurer, defendant Zurich Insurance Company (Zurich). Zurich's denial *562 of coverage to CDS triggered the declaratory judgment action now before us, and the focus of this appeal is on whether CDS is entitled to coverage under the policy for Campbell's damages. The trial court granted summary judgment in favor of Zurich. The action by Campbell has been settled.
The underlying facts are straightforward. On January 29, 1999, Campbell notified CDS that "Splash products [that had been stored at CDS] were shipped out of turn with expiration dates exceeding a twenty day window." Campbell informed CDS that this misrotation would result in it "be[ing] forced to sell [the affected product] to secondary markets as lower grade product and at less than 50 percent of Bulletin Price." In an apparent effort to mitigate damages, Campbell sold the misrotated product in secondary markets and donated the remaining portion to charity. Campbell claimed that because it was unable to ship the misrotated product in its usual retail supply chain, it sustained a loss of $1,384,727.00.
In February 1999, CDS notified Zurich of the potential claim based on the alleged misrotation of the Campbell Splash products. CDS had obtained insurance from Zurich that included a Comprehensive General Liability ("CGL") policy, and a Commercial Inland Marine policy containing a Warehouseman's Liability ("WL") form. The WL form provided liability coverage to the CDS warehouse located in Wharton, New Jersey where the Splash product was kept prior to shipment. On February 18, 1999, Zurich acknowledged receipt of CDS' claim, noting that it would begin its investigation and review of the claim immediately.
On February 22, CDS Vice President John Fisher provided Zurich with correspondence between CDS and Campbell regarding "the potential misrotation of Campbell `Splash' product." Fisher stated in the letter, "[o]ur discussions with Campbell, since mid-August, have been based on the fact that the `Splash' inventory we received was not selling, therefore causing us to use far more space then [sic] we anticipated. As a result, this put our entire operation in jeopardy from a rotational standpoint."
On May 6, 1999, Zurich claims manager Randy Wilburn denied coverage on the basis that Campbell's loss was due to the product not being sold and stated that no determination had yet been made regarding the impact of any misrotation on the product's impending expiration date. According to Wilburn,
We understand that on or around January 22, 1999, Campbell's Soup Company requested 50,000 square feet of space to store a product called "Splash." The product did not sell very well, and Campbell's Soup Company ended up using over 350,000 square feet of space in your warehouse. Due to the extreme volume of incoming shipments, we understand that it was almost impossible to keep track of the product, and some of the product may have been misrotated by the warehouse. However, the majority of the product went bad simply because the product did not sell. It is undetermined at this time if the possible misrotation had any effect on the product going bad.
Wilburn also cited two "exclusion" provisions in the WL policy, which read as follows:
B. EXCLUSIONS
....
2. We will not pay for a "loss" caused by or resulting from any of the following:
a. Delay, loss of use, loss of market, or any other consequential loss.

*563 ....
g. Wear and tear, any quality in the Covered Property that causes it to damage or destroy itself, hidden defect, gradual deterioration, depreciation, mechanical breakdown, insects, vermin, rodents, corrosion, rust, dampness, dryness, cold, or heat.
CDS then informed Zurich in a letter dated May 14, 1999, that it had "received new correspondence from Campbell's showing that 100 percent of the claim is due to misrotation, and not because the product was not selling."
As we have indicated, Campbell brought its suit against CDS in June 2000. It alleged negligence, breach of contract, and conversion based upon the misrotation of its product, namely, the failure to properly distribute it according to its manufacture or expiration date. Although CDS tendered its defense to Zurich, the insurer denied coverage in a letter dated June 28, 2000.
The parties' communications on the coverage issue included an October 11, 2000, notice from Wilburn to CDS that it was covered for "direct physical loss," not "gradual deterioration," and that any role misrotation may have played was irrelevant for purposes of coverage. CDS then instituted this declaratory judgment action, after which a consent judgment was entered in Campbell's suit.
When Zurich moved for summary judgment in this action, it contended that there was no coverage under the WL form because the alleged misrotation did not cause a "direct physical loss." The relevant provisions as to coverage in the WL form issued by Zurich state:
A. Coverage
1. We will pay on your behalf all sums that you become legally obligated to pay as a warehouseman or bailee as damages for "loss" caused by a Covered Cause of Loss to COVERED PROPERTY contained in your "premises."
....
5. Covered Causes of Loss
Covered Causes of Loss means RISKS OF DIRECT, PHYSICAL "LOSS" to Covered Property during the policy period, except those causes of "loss" listed in the Exclusions.
....
F. DEFINITIONS
1. "Loss" means accidental loss or damage.
Zurich further asserted that if the product's impending expiration was a "loss" as defined in the policy, it was expressly excluded by the coverage exemption for loss based on gradual deterioration.
In connection with the summary judgment hearing, the trial court considered the meaning and scope of the term "direct, physical loss" as it defines the covered causes of loss in paragraph (A)(5) of the WL form just quoted. It established that CDS obtained the WL coverage to fill the gap created by the "care, custody, and control exclusion" contained in the CGL policy, and on appeal, there remains no dispute on that point. Zurich argued that the product had not actually expired, but merely that the period had passed in which it could be distributed at full market value. According to Zurich, therefore, there was no coverage because there was no "direct, physical loss." CDS contended that a reasonable interpretation of the contract language is that a reduction in market value constitutes a loss. Zurich took the position that if the product had expired and had "acquire[d] some kind of a taste or smell that's different than it should be, and obviously anybody who opens that package is not going to consume that, ... there's a *564 good argument that's a direct physical loss."
Another issue before the trial court was whether this type of loss was precluded under the exclusions in the WL form. Zurich informed the court that it had abandoned reliance on the "gradual deterioration" exclusion, and instead was relying on section (B)(2)(a), which excludes loss resulting from a "delay, loss of use, loss of market, or any other consequential loss." CDS contended that this provision was ambiguous, and that "loss of market" did not exclude a "loss of market value."
In granting summary judgment in favor of Zurich, the trial judge made findings including a determination that misrotation, which resulted in distribution at submarket values, did not constitute a direct and physical loss. Additionally, the court found that the exclusion provision under section (B)(2)(a) applied because there was "a substantial loss of use" given that the product could not be sold through the normal distribution channels.
In this appeal, we note no genuine material issues of fact, Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995). Our focus instead is on some challenging issues of construction respecting the coverage and exclusions provisions in the WL form issued by Zurich to CDS.
We approach our interpretive tasks concerning the policy damage in this appeal in the context of firmly established principles. First, as we stated in Atlantic Mut. Ins. Co. v. Palisades Safety & Ins. Co., 364 N.J.Super. 599, 604, 837 A.2d 1096 (App.Div.2003):
The determination of whether an individual is an insured under an insurance policy is a matter of law to be decided by the court. National Union Fire Ins. v. Transportation Ins. Co., 336 N.J.Super. 437, 443, 765 A.2d 240 (App.Div.2001). The court should interpret the policy "according to its plain and ordinary meaning." Progressive Cas. Ins. v. Hurley, 166 N.J. 260, 272-73, 765 A.2d 195 (2001). However, the "policy should be construed to comport with the insured's reasonable expectations of coverage." Id. at 274, 765 A.2d 195 (citing Gibson v. Callaghan, 158 N.J. 662, 669-71, 730 A.2d 1278 (1999)). Therefore, the court should only enforce those restrictions or terms in the policy that are consistent with the insured's "objectively reasonable expectations." Ibid.

Furthermore, if an insurance policy's terms are capable of supporting two distinct outcomes as to whether there is coverage, the subject language must be interpreted in favor of the insured. Mazzilli v. Accident & Cas. Ins. Co. of Winterthur, Switzerland, 35 N.J. 1, 7-8, 170 A.2d 800 (1961). "Courts are bound to protect the insured to the full extent that any fair interpretation will allow." Id. at 7, 170 A.2d 800. Our Supreme Court has described ambiguity as arising "where the phrasing of the policy is so confusing that the average policyholder cannot make out the boundaries of coverage." Weedo v. Stone-E-Brick, Inc., 81 N.J. 233, 247, 405 A.2d 788 (1979). When the issue of ambiguity before the court pertains to an "exclusion or exception, designed to limit the protection, a strict interpretation is applied." Mazzilli, 35 N.J. at 8, 170 A.2d 800; see generally, Simonetti v. Selective Ins. Co., 372 N.J.Super. 421, 859 A.2d 694 (App.Div.2004).
Addressing first the coverage issue, we consider whether there was, in the words of the WL coverage provision, a "Covered Cause[] of Loss," namely a "RISK[ ] OF DIRECT, PHYSICAL `LOSS' to Covered Property during the *565 policy period"? We conclude that there was.
In our view, the trial court erred in finding that the misrotation was not a direct physical loss, or a risk of such loss, and in the alternative we further conclude that the policy language as to such coverage was ambiguous in the context of this dispute and should be construed against Zurich and in favor of the insured. First, we note that, for coverage to apply, it was not necessary that the product's material or chemical composition be altered. The bottles of Splash could have broken and the product then would have been damaged even though its chemical composition remained unchanged. The loss certainly would have been covered.
The same is true if the product remained undamaged and uncontaminated, but a leak or fire at the warehouse damaged the labeling or bottling of the product. In neither of these instances does the term "physical" require or contemplate that the material composition of the product itself be changed or affected.
Additionally, the term "risk" in the provision "RISK[ ] OF DIRECT, PHYSICAL `LOSS'" supports the view that the policy does not require that there be any actual physical damage to or alteration of the material composition of the property or its packaging. In that respect, the reasoning of the Supreme Court of South Carolina in Ocean Winds Council of Co-Owners, Inc. v. Auto-Owner Ins. Co. 350 S.C. 268, 565 S.E.2d 306 (2002) is persuasive. In Ocean Winds, which was recently cited with approval in Buczek v. Continental Cas. Ins. Co., 378 F.3d 284, 291 (3d Cir.2004), the policy covered "risks of direct physical loss involving collapse of a building or any part of a building." 565 S.E.2d at 307. The issue was that "Ocean Winds alleges its buildings have suffered `substantial structural impairment' from hidden decay as a result of water infiltration and termite damage although the buildings have not yet fallen to the ground. Insurer contends coverage is not triggered until the buildings have actually fallen to the ground." Ibid.
Litigation in federal court led to that court certifying to the Supreme Court of South Carolina the question: "In order to trigger coverage [under the policy quoted above], is it required: 1) that the building or part of the building fall to the ground or be reduced to flattened rubble; or 2) that the building manifest substantial structural impairment, but has not yet fallen to the ground or been reduced to flattened rubble?" Ibid. In responding to the certified question, the Supreme Court rejected the contention that actual collapse was required and held that in view of the "risks" language,
We find a requirement of imminent collapse is the most reasonable construction of the policy clause covering "risks of direct physical loss involving collapse." We define imminent collapse to mean collapse is likely to happen without delay. This construction protects the insured without distorting the purpose of the clause to protect against damage from collapse. The policy at issue therefore requires proof of imminent collapse for coverage to be triggered.
[Id. at 307.]
Similarly, here we conclude that the presence of the term "risks" in Zurich's policy means that an actual material change in the product is not a requisite for the triggering of coverage.
In considering the parties' reasonable expectations, moreover, it is appropriate to take into account, when reading the coverage language, the policy's provisions respecting exclusions, insofar as one may help give content to the other. *566 The pertinent exclusions contained in Zurich's WL form provide:
B. EXCLUSIONS
....
2. We will not pay for a "loss" caused by or resulting from any of the following:
a. Delay, loss of use, loss of market, or any other consequential loss. rodents, corrosion, rust, dampness, dryness, cold, or heat.
What is the purpose of the "loss of market" policy exclusion, and is it counter to an interpretation that would extend coverage to the property in this case? Although we are afforded no significant assistance by the record in this respect, it seems to us that a main object of the exclusion, if not the sole object, is to make it clear that the policy is intended to insure warehouses that are doing the work of warehouses, and not to insure against activities of warehouses that are, for example, holding products in order to speculate in them rather than to store or distribute them.
To find coverage here would not run contrary to such a purpose or to the coverage language in these circumstances. There is no dispute that CDS was acting as a warehouse in storing and distributing the Splash product. It was not speculating in the beverage market. Furthermore, any fault of CDS in the storage and distribution of Splash which may have caused or contributed to the loss would probably have been the result of its negligence or failure to act with respect to its functions as a warehouse.
Here, what occurred was that the Splash beverage changed. Granted, it was not a change in material composition but in how the product was perceived by Campbell's customers as a result of an undue passage of time. The charge stemmed from CDS's alleged fault in handling the task of product rotation. In our view, such a change is the functional equivalent of damage of a material nature or an alteration in physical composition. By reason of this change, and of the ensuing new perception of the covered property and its nature, the product lost value as much from the outdating as if it had turned sour or gone bad in some more tangible or material way. It occurred essentially in the same manner and with virtually the same effect. We conclude that the policy is clear as a matter of law in this respect, but that if it were deemed to be susceptible of a contrary reading, the policy is nevertheless at least ambiguous, and as we have already observed, the ambiguity in such circumstances results in a construction in favor of coverage.
We perceive that it fulfills, rather than does violence to, the WL coverage provisions, to find coverage in favor of CDS here. At a minimum, even if the policy is ambiguous and coverage is not clearly present, any ambiguity on the point should be resolved in favor of coverage. If an alteration in the product's material or its packaging were requisite, coverage would not exist, but as we have shown, it is manifest that coverage can exist without such alteration. Since "physical" can mean more than material alteration or damage, it was incumbent on the insurer to clearly and specifically rule out coverage in the circumstances where it was not to be provided, something that did not occur here.
With respect to the interpretation of policy exclusions, the only language that is pertinent on this appeal is clause B(2)(a) of the exclusions, namely, whether CDS's liability was the result of "Delay, loss of use, loss of market, or any other consequential loss." We conclude that it plainly was not.
In the first place, this clause appears to describe damages of the insured, not others, and the damages CDS seeks to have covered by the WL policy were manifestly *567 not in the nature of consequential damages of CDS, nor did CDS lose a market or lose use of the product. But even further, there is nothing in the record to show that even Campbell lost its market for prime condition Splash. Indeed, the contrary is necessarily true, because otherwise it would seem doubtful that CDS would have been responsible to Campbell for any damages by reason of the excessive age of the product. In other words, if the market for "good" Splash had disappeared, then CDS could not have damaged Campbell by letting the Splash in the warehouse get old because, with the market therefor lost, it would not have been sold in the prime market even if it had been properly rotated. If a new car purchaser drives his car out of the showroom and tries to re-sell it after driving it around the block, it is not the new car market that has been lost but the car's character as a new one. And this can be the case even when physical changes in the car itself are non-existent or barely perceptible.
Similarly, Campbell's market for new and current Splash was not lost. Rather, it was the change in the perceptions of the Splash by Campbell's customers that changed when the beverage reached a certain age. As a result, we determine that none of the loss of market exclusions relied on by Zurich is applicable.[*]
CDS further contends that the "loss of use" exclusion in the WL form was inapplicable because that exclusion would render the policy illusory. CDS also contends that the loss of use exclusion does not apply here because Campbell was able to sell the product to secondary markets. Zurich contends that the loss of use exclusion is applicable because the use referred to is the product's diminished utility, and not a physical loss.
Section (B)(2)(a) of the WL form provides that Zurich will not pay for "loss" caused by "[d]elay, loss of use, loss of market, or any other consequential loss." The trial court observed:
Here we have a loss of use. We don't have total loss of use, we have a substantial loss of use. But it's still loss of use in that ... there was loss of use, not in the sense that the product had to be thrown in the Atlantic Ocean because it was totally useless, but because it could not be generated through or sold through its normal distribution products. So I think that the exclusion would apply even if there was initial coverage.
Once again, we see this exclusion as characterizing damages of the insured, CDS, and the insured sustained no loss of use. In any event, it appears that the trial court interpreted the "loss of use" exclusion to mean a loss of market, rather than a mere diminution in the product's utility.
Moreover, if it were assumed, arguendo, that the "loss of market" and "loss of use" exclusions ought to be construed as contended by Zurich, namely, to include the type of loss caused by misrotation, there would be merit in CDS' contention that those terms are illusory in relation to the initial coverage provisions. An illusory promise is defined as one "in which the promisor does not bind himself." Blacks Law Dictionary 1213 (6th ed.1990). Pursuant to the definitional scope of those exclusions as urged by Zurich, there does not readily appear to be a "physical direct loss" that would not also constitute some type of loss in use or market value. Generally, any direct physical loss will have a *568 negative impact on either the insured product's utility, or distribution at its primary market value. Zurich maintains that "[a] mere loss of the use of insured property is purely an economic loss associated with a product's utility, and not a `direct physical loss.'" This assertion, however, fails to distinguish between an economic loss caused by a diminution of the product's utility, and a physical loss where the diminished utility results in a similar economic loss. We decline to construe these exclusions in a manner that makes promises in the coverage section illusory. See Russell v. Princeton Laboratories, Inc., 50 N.J. 30, 38, 231 A.2d 800 (1967) (holding that contracts should not be interpreted to vest a promisor with the ability to make his promise illusory).
The WL form issued by Zurich to CDS thus covered the losses claimed by Campbell as a result of the misrotation of the Splash, and no exclusion in the policy relied upon by Zurich applies.
Reversed.
NOTES
[*] The court did not make an express finding regarding whether there was a loss of market, noting that the parties' had differing views as to the meaning of "market." Nor did the court did not address the "gradual deterioration" exclusion contained in section (B)(2)(g) because Zurich had abandoned its position with regard to that exclusion. Finally, the court did not make a finding as to whether the "delay" exclusion was applicable.