**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 10-1397
_____

CHARLES STAFFORD, Appellant

v.

SCOTTSDALE INSURANCE COMPANY
_____

On appeal from the United States District Court
for the District of New Jersey
(D.C Civil No. 2-08-cv-03629)
District Judge: Hon. Peter G. Sheridan
_____

Submitted Under Third Circuit LAR 34.1(a)
November 17, 2010

Before: BARRY, CHAGARES, and VANASKIE, Circuit Judges.

(Filed: December 3, 2010)

_____

OPINION
_____

CHAGARES, Circuit Judge.

Plaintiff, Charles Stafford, seeks a declaration that a homeowner's insurance

policy issued by defendant, Scottsdale Insurance Company ("Scottsdale"), provided

personal liability coverage for injuries sustained in a dog attack. The District Court

granted summary judgment to Scottsdale. Because we agree with the District Court that, as a matter of law, the insurance policy at issue excluded coverage for personal liability arising out of injuries caused by an animal, we will affirm.

I.

As we write solely for the benefit of the parties, we will only briefly recite the essential facts. On June 2, 2005, while walking on the sidewalk near his Maplewood, New Jersey home, Charles Stafford was attacked by Oliver Kennedy's dog, a pit-bull mix named Tank. Tank's attack on Stafford caused him severe injuries, which required seven surgeries to repair. Having incurred substantial medical expenses, Stafford sued Kennedy in the Superior Court of New Jersey for negligent supervision of his dog, as well as a strict liability violation of New Jersey's Dog Bite Act. Stafford ultimately decided not to pursue the strict liability claim, but he won a $1,107,500 default judgment stemming from Kennedy's negligence. In its judgment, the Superior Court made several findings of fact regarding Kennedy's negligent conduct. Of particular relevance to this action is the Superior Court's factual finding that Tank's attack on Stafford was proximately caused by Kennedy's negligent failures to (1) contain Tank within a fence, despite a prior attack, (2) properly train Tank, and (3) provide Tank with adequate exercise. Based on these findings, the Superior Court concluded that Kennedy was liable to Stafford for negligent supervision of his dog.

Kennedy kept Tank on the property of his sister, Natalie Kennedy, with whom he lived at the time. Natalie Kennedy held a homeowner's insurance policy issued by Scottsdale (the "Policy"), which was in effect at the time of the attack and which

2

provided personal liability coverage to the insured for "bodily injury" arising from an "occurrence," subject to a $300,000 limit.[1]  Appendix ("App.") at 47.  Importantly, however, the Policy also contained an exclusion, marked conspicuously with the heading "THIS ENDORSEMENT CHANGES THE POLICY," that denied coverage for "'bodily injury'… caused by any animal, whether owned or not owned by any 'insured'" (the "Animal Exclusion").  App. at 114.  Pursuant to this Animal Exclusion, Scottsdale refused to defend Kennedy in Stafford's personal injury lawsuit and similarly declined to indemnify Kennedy for the subsequent judgment against him.

After the Superior Court entered judgment, Kennedy assigned his claim for coverage under the Policy to Stafford, who then brought this action seeking a declaration that the Policy provided personal liability coverage for the negligence claim that arose out of Tank's attack.  The District Court granted Scottsdale's motion for summary judgment, finding that the Animal Exclusion unambiguously precluded coverage for Stafford's injuries and that Scottsdale, therefore, had not acted in bad faith when it refused to defend against the negligence claim arising from those injuries.

II.

The District Court had diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332.  We exercise appellate jurisdiction pursuant to 28 U.SC. § 1291.

---

[1]Oliver Kennedy has alleged that he is an additional insured under the policy issued to Natalie Kennedy.  For purposes of this action, Scottsdale has assumed that Oliver Kennedy qualifies as an insured under the policy issued to his sister, while reserving the right to contest his insured status.

"We subject the District Court's grant of summary judgment to plenary review, and we apply the same standard that the lower court should have applied." Smathers v. Multi-Tool, Inc., 298 F.3d 191, 194 (3d Cir. 2002). By that standard, summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In making this determination, we must "view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." Farrell v. Planters Lifesavers Co., 206 F.3d 271, 278 (3d Cir. 2000). A district court's interpretation of state law and its findings as to the legal operation of an insurance policy are conclusions of law which we review de novo. Royal Ins. Co. of Am. v. KSI Trading Corp., 563 F.3d 68, 73 (3d Cir. 2009).

Because this case comes before us pursuant to diversity jurisdiction, we apply the substantive law as decided by the highest court of New Jersey, the state whose law governs this action. See Orson, Inc. v. Miramax Film Corp., 79 F.3d 1358, 1373 n.15 (3d Cir. 1996) (citation omitted).[2]

### III.

---

[2] "When the state's highest court has not addressed the precise question presented, [we] must predict how the state's highest court would resolve the issue," Orson, 79 F.3d at 1373 n.15, and to do so, "we must consider relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand," Covington v. Cont'l Gen. Tire, Inc., 381 F.3d 216, 218 (3d Cir. 2004) (quotation omitted). Most significantly, the "decisions of state intermediate appellate courts should be accorded significant weight in the absence of an indication that the highest state court would rule otherwise." Orson, 79 F.3d at 1373 n.15.

"[C]onstruction of an insurance policy must be approached with a well settled doctrine in mind. If the controlling language will support two meanings, one favorable to the insurer, and the other favorable to the insured, the interpretation sustaining coverage must be applied. Courts are bound to protect the insured to the full extent that any fair interpretation will allow." Mazzilli v. Accident & Cas. Ins. Co. of Winterthur, Switz., 170 A.2d 800, 803 (N.J. 1961); see also Flomerfelt v. Cardiello, 997 A.2d 991, 996 (N.J. 2010). Still, the law "will not make a better contract for parties than they themselves have seen fit to enter into, or alter it for the benefit of one party and to the detriment of the other. The judicial function of a court of law is to enforce the contract as it is written." James v. Fed. Ins. Co., 73 A.2d 720, 721 (1950) (quotation omitted); see also Flomerfelt, 997 A.2d at 996. In other words, when an insurance policy's language is clear and unambiguous, the court is bound to enforce it according to its plain and ordinary meaning. Voorhees v. Preferred Mut. Ins. Co., 607 A.2d 1255, 1260 (N.J. 1992).

In keeping with the general principles outlined above, New Jersey law dictates that, "if the clause in question is one of exclusion or exception, designed to limit the protection [provided by an insurance policy], a strict interpretation is applied." Mazzilli, 170 A.2d at 804; see also Flomerfelt, 997 A.2d at 996. A court will enforce an exclusionary clause only if it is "specific, plain, clear, prominent, and not contrary to public policy." Princeton Ins. Co. v. Chunmuang, 698 A.2d 9, 17 (N.J. 1997) (quotation omitted). But, as with all contract language, if the language of an exclusionary clause is clear and unambiguous, "a court should not engage in a strained construction to support

5

the imposition of liability." Flomerfelt, 997 A.2d at 996 (quoting Longobardi v. Chubb Ins. Co., 582 A.2d 1257, 1260 (N.J. 1990)).

Applying these well-established principles of interpretation to the exclusionary clause at issue here, we agree with the District Court that the Policy's language could not be clearer. The Policy provided its insured with personal liability coverage for "bodily injury" arising from an "occurrence", subject to a $300,000 limit. App. at 47. But the Animal Exclusion explicitly denied such coverage for "'bodily injury'… caused by any animal…." App. at 48, 114. Read in accordance with its plain and ordinary meaning, this contractual language could only lead a reasonable person to conclude that the Policy does not provide personal liability coverage for bodily injuries sustained in the course of an animal attack, such as those that Tank inflicted on Stafford.

Nonetheless, Stafford argues that the Animal Exclusion does not preclude personal liability coverage under the circumstances because Kennedy's negligence in supervising Tank was a concurrent source of his liability, independent of Tank's attack, for which the Policy provides coverage. In support of this argument, Stafford relies on the concurrent causation doctrine set forth in Salem Group v. Oliver, 607 A.2d 138 (N.J. 1992). In Salem Group, the New Jersey Supreme Court held that an insurance policy provided personal liability coverage for an accident involving a minor's use of the insured's motor vehicle, despite a motor vehicle exclusion, because the fact that the insured also served alcohol to the minor was a concurrent cause of the accident, for which the policy at issue provided personal liability coverage. Id. at 140. In reaching its decision, the court emphasized that "the serving of alcohol to a minor does not depend on the insured's

6

ownership of a motor vehicle or its entrustment to another." Id. Indeed, if the minor claimant, having been served alcohol by the insured, had suffered injuries utterly unrelated to the use of a motor vehicle, the insured would still have been exposed to liability as a social host, which was covered by the relevant insurance policy. Accordingly, the court found that the insurer could not avoid its obligation to defend its insured on the social host claim merely because a separate excluded risk — the operation of a vehicle — constituted an additional discrete act of negligence causing the claimant's injuries. Id.

Despite Stafford's lengthy arguments to the contrary, we agree with the District Court that this case is readily distinguishable from Salem Group. Unlike the situation presented by that case, which involved two entirely distinct negligence claims upon which to premise liability for the claimant's injuries, one of which was covered by the policy and one of which was not, Kennedy's liability for Stafford's injuries flows from his allegedly negligent supervision of Tank. And Kennedy's negligent supervision of Tank simply cannot be considered a cause of Stafford's injuries, separate and apart from Tank's attack.[3] See Owens v. Prudential Prop. & Cas. Ins. Co. of N.J., 763 A.2d 792, 795 (N.J. Super. Ct. App. Div. 2000) (holding that a motor vehicle exclusion precluded coverage for a negligent entrustment of a motor vehicle claim against the insured because, "[u]nlike the facts in Salem, we are not dealing here with an independent,

---

[3]Kennedy's reliance on Flomerfelt v. Cardiello, 997 A.2d 991, 996 (N.J. 2010), is similarly misplaced. Like Salem Group, Flomerfelt addresses the application of the concurrent causation doctrine to a injury for which there were two distinct negligence claims on which to premise liability, one of which was covered by the relevant policy and one of which was not.

7

discrete act of negligence (such as service of alcohol to a minor) unrelated to the use or operation of a motor vehicle").

As New Jersey law makes clear, liability for negligent supervision is grounded in the insured's failure to protect the plaintiff from injury in a situation where the insured bore the legal obligation to do so. See Robert W. Hayman, Inc. v. Acme Carriers, Inc., 696 A.2d 1125, 1128 (N.J. Super. App. Div. 1997). Viewed in such a light, it is readily apparent that an insured's negligence in supervising the cause of the harm cannot, as a matter of logic, be considered a source of liability that is isolable from the harm itself. To the contrary, the two are inextricably intertwined; there is no liability, but for the harm. See, e.g., Robert W. Hayman, 696 A.2d at 1128-29 (holding that a theft exclusion precluded personal liability coverage for a negligent supervision claim against an insured that arose out of the theft of the plaintiff's property because "the negligent supervision is premised on [the defendant's] failure to protect the plaintiff's property and is intertwined with the theft…"). Indeed, in this case, the breach of duty upon which the Superior Court premised its finding of negligence was Kennedy's failure to restrain his dog from causing harm to others. Absent Tank's injury-causing attack, Kennedy's conduct could not have been deemed negligent at all.[4]

_____

[4] Stafford argues, in this regard, that the District Court failed to give full faith and credit to the Superior Court's findings of fact that Kennedy was negligent in failing to contain Tank within a fence and failing to properly train Tank. This is simply not true. The District Court faithfully abided by the Superior Court's factual findings in the underlying negligence action, but concluded, as a matter of law, that Kennedy's negligence in supervising was not a tortious wrong independent of the harm that Tank caused to Stafford. Rather Kennedy's failures with regard to Tank's supervision were only wrongs against Stafford because those failures were responsible for Tank's injury-causing attack.

8

In short, Kennedy's negligence in supervising Tank was the cause of Stafford's bodily injuries, and the Animal Exclusion precludes personal liability coverage for the lawsuit stemming therefrom. To hold otherwise would require us to engage in precisely the type of "strained construction" of the Policy that New Jersey law prohibits. See Flomerfelt, 997 A.2d at 996 (quotation omitted).

IV.

Stafford next argues that Scottsdale acted in bad faith when it refused to defend Kennedy against Stafford's negligence claim.

> [T]he duty to defend comes into being when the complaint states a claim constituting a risk insured against. Whether an insurer has a duty to defend is determined by comparing the allegations in the complaint with the language of the policy. When the two correspond, the duty to defend arises, irrespective of the claim's actual merit. If the complaint is ambiguous, doubts should be resolved in favor of the insured and thus in favor of coverage.

Voorhees, 607 A.2d at 1259 (quotations and citations omitted). To succeed in his claim that Scottsdale acted in bad faith when it refused to defend its insured, Stafford must demonstrate that, comparing the Policy language to the allegations in the complaint, there existed no "fairly debatable" reason for denying coverage. See Hudson Universal, Ltd. v. Aetna Ins. Co., 987 F. Supp. 337, 341 (D.N.J. 1997) (citing Pickett v. Lloyd's (A Syndicate of Underwriting Members), 621 A.2d 445, 453 (N.J. 1993)). This Stafford cannot do. Having concluded that the Animal Exclusion clearly and unambiguously precludes personal liability coverage for the injuries caused by Tank's attack, we must also conclude that, at the very least, there existed a fairly debatable reason for Scottsdale

9

to refuse to defend against Stafford's claim for negligent supervision of the offending animal in the first instance.[5]

V.

For these reasons, we will affirm the judgment of the District Court.

---

[5] Stafford asserts, without explanation, that "Plaintiff's expert's report creates a question of fact." See Stafford Br. at 28. By this we assume that Stafford means to raise a question of fact with regard to whether Scottsdale had a duty to defend the underlying action. But this question is one of law that the court must answer based on a comparison of the allegations in the complaint with the policy language. See, e.g., Robert W. Hayman, 696 A.2d at 1127.